

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 16, 2016 Session

## STATE OF TENNESSEE v. WILLIAM CHARLES BURGESS

### Appeal from the Criminal Court for Knox County
#### No. 103785    Bob R. McGee, Judge

### No.  E2015-02213-CCA-R3-CD

The Defendant, William Charles Burgess, was convicted by a Knox County Criminal Court jury of one count of preventing or obstructing an arrest and two counts of obstructing or preventing service of process, Class B misdemeanors.  *See* T.C.A. § 39-16-602 (2014).  The trial court sentenced the Defendant to six months, with all but ten days suspended to supervised probation.  On appeal, the Defendant contends that the evidence is insufficient to support his convictions.  Because the Defendant's conduct did not constitute a criminal offense, we reverse the judgments of the trial court, vacate the Defendant's convictions, and dismiss the charges.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Convictions Vacated; Charges Dismissed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

A. Philip Lomonaco, Knoxville, Tennessee, for the appellant, William Charles Burgess.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Charme P. Allen, District Attorney General; and Amanda Cox and Nathaniel Ogle, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case arises from an October 24, 2013 incident in which Knox County Sheriff's deputies conducted a warrantless entry into the Defendant's mother's home in order to arrest the Defendant for evading civil process related to a delinquent credit card account.  The Defendant hid in a basement crawl space and refused to emerge, at which

point deputies ordered a police dog to attack the Defendant and shocked him multiple times with a Taser.

The trial testimony established that the Defendant was the owner of an optical lens business and worked part-time for his brother as a commercial landscaper. Both businesses were located at the Defendant's mother's house, and the Defendant had a workshop in his mother's basement.

Knox County Sheriff's Deputy Chuck Bowers testified that he had worked for the sheriff's office in the civil warrants division for twenty-seven years, that he had previously served the Defendant with a civil warrant, and that he attempted to serve the Defendant in the present case. Deputy Bowers identified a civil warrant issued against the Defendant and said Discover Bank was the plaintiff. Deputy Bowers stated that in order to serve the Defendant, Deputy Bowers needed to hand him a copy of the warrant.

Deputy Bowers testified that beginning in early September 2013, he attempted to serve the Defendant between twenty-two and twenty-four times. Deputy Bowers said that he went to the Defendant's house multiple times, that no one answered when he knocked, and that he left a business card. Deputy Bowers stated that on one occasion, he heard an unknown person moving in the house, that Deputy Bowers identified himself, that the person hid and did not open the door, and that Deputy Bowers left. Deputy Bowers said that on another occasion, he spoke with the Defendant's wife and that she was unwilling to accept service on the Defendant's behalf. Deputy Bowers said that he had to have the Defendant's permission to leave the civil warrant with someone at the Defendant's house. Deputy Bowers said that he could not obtain the Defendant's permission to leave the warrant with his wife.

Deputy Bowers testified that he went to the Defendant's mother's house on multiple occasions and that he spoke to the Defendant's parents. Deputy Bowers said that on one occasion, the Defendant's mother told him that the Defendant had just left, that the Defendant's mother called the Defendant and asked him to return, and that he refused. Deputy Bowers stated that the Defendant told his mother to tell Deputy Bowers to get off the Defendant's property because he was trespassing.

Deputy Bowers testified that generally, if he had difficulty serving a civil warrant because he could not find the person, he returned the warrant unserved after thirty and sixty days and that the plaintiff would have to re-file "for us to keep trying it." He said that the only circumstances in which he would serve the warrant by leaving it with a third party was if he spoke to the named defendant on the telephone and obtained permission to leave the warrant with a designated agent. He denied ever leaving a warrant in the screen door of a house. He said that in twenty-seven years, he had never had as much difficulty serving someone as he did the Defendant.

Deputy Bowers testified that on September 18, he parked at the end of the Defendant's driveway, stood outside, and began walking up the driveway when he heard a truck's engine start. Deputy Bowers stated that the truck began coming down the driveway, that the truck came "right at [him]," and that when the truck came within arm's reach, Deputy Bowers drew his gun. Deputy Bowers said that he did not know if the truck was going to hit him and that when he drew his gun, the truck swerved into the yard, crossed the curb onto the road, and "fled the scene." He said that two people were in the truck, that he could not identify the Defendant as the driver, and that he did not take any legal action.

Deputy Bowers identified a list documenting the twenty-four times he attempted to serve the Defendant. He also identified a photograph of the Defendant's lawn. The photograph showed tire tracks on a grassy space connecting a roadside curb and a wooded area. Deputy Bowers said that the line of a driveway was present in the photograph and identified where his vehicle had been parked, where he was standing, and where the truck began to swerve into the grass. He stated that the tire tracks came from "the vehicle that was coming at me."

Deputy Bowers testified that after the incident with the truck, he was cautious in attempting to serve the Defendant and sometimes asked other deputies to accompany him. He stated that his subsequent attempts were unsuccessful. He said that when he could not contact a defendant, he returned "the process not to be found."

Deputy Bowers testified that on October 24, 2013, he went to the Defendant's mother's house, that he parked at a restaurant beside the house, and that he thought he saw the Defendant walking across the driveway. Deputy Bowers said that he pulled into the driveway and that an employee of a business in the house told him the Defendant was inside. Deputy Bowers stated that he watched the house and that he requested backup. He said that Sergeant Jenkins arrived first and that other deputies joined them, including a K-9 deputy and his dog.

Deputy Bowers testified that Sergeant Jenkins was his supervisor and that once she arrived, he "sat back" while Sergeant Jenkins spoke with the Defendant's mother. Deputy Bowers said that he entered the front door, went downstairs into the basement, and returned outside to search for the Defendant. Deputy Bowers denied opening drawers or searching in small spaces. He said that other deputies went inside the house. He said that he believed the Defendant had "evaded," obstructed, and prevented service.

On cross-examination, Deputy Bowers testified that he was persistent in his attempt to serve the Defendant and that generally, he did not have to try twenty times to serve someone. He denied being frustrated by the Defendant and said that he drove past the Defendant's house daily because it was on his way to work.

-3-

Relative to the September 18 incident, Deputy Bowers testified that he began walking up the driveway before the truck appeared, that he saw two individuals in the truck, and that he told every deputy who accompanied him after the incident that the Defendant had attempted to run over him. Deputy Bowers denied that every deputy who responded on October 24 thought the Defendant had attempted to run over Deputy Bowers and that the September 18 incident was "general conversation" among the department. Deputy Bowers acknowledged that Sergeant Jenkins and his supervisors knew about the September 18 incident. He said relative to the September 18 incident that he "had a pretty good feeling" the Defendant was driving the truck and that on September 18, he was holding his radio and was dressed in uniform.

Deputy Bowers testified that his uniform consisted of a t-shirt with the sheriff's office logo, a badge worn on his belt, a gun, and a radio. Deputy Bowers disagreed that the Defendant did not try to hit him with his truck. Relative to the Defendant's swerving the truck away from him, Deputy Bowers said that if someone drew a weapon at him, he would have swerved as well. Deputy Bowers agreed that he believed the Defendant was trying to avoid being served that day and that later in the day, he spoke to the Defendant's mother at the Defendant's workplace. Deputy Bowers said that he stood close enough to hear the Defendant tell his mother to tell Deputy Bowers to leave because he was trespassing. Deputy Bowers denied that the Defendant's mother told him the Defendant would return at 5:00 p.m. Deputy Bowers denied telling an employee at the Defendant's workplace that he had to use the restroom and walking away. Deputy Bowers denied telling another employee at the Defendant's workplace, "[Y]ou better tell [the Defendant] that he better let me serve him or I'm going to get him[.]" Deputy Bowers thought that he spoke to the Defendant's father on September 18 and denied that he spoke to the Defendant.

Deputy Bowers testified that he requested backup on his radio or by calling his supervisor. He said that generally, when a deputy called for backup, everyone responded. Deputy Bowers believed he spoke to the Defendant's wife before the September 18 incident but was uncertain. Deputy Bowers did not know what Tennessee Civil Procedure Rule 4 stated about methods of service. Deputy Bowers agreed that the Defendant's wife was a person of suitable age and discretion with whom he could have left the civil warrant. After reviewing Rule 4, he acknowledged that the rule did not require a third party to consent to service on behalf of a named defendant. He agreed that he could have dropped the warrant at the Defendant's wife's feet and told her to give it to the Defendant but said that he had been taught to "cover my rear end" and only to leave the warrant with a defendant, unless he had the defendant's consent. When asked whether the Defendant had to be "avoiding" process, as opposed to "evading" process, in order to serve the Defendant's wife in the Defendant's stead, Deputy Bowers responded, "[T]hat's the way I understand it[.]" Deputy Bowers said that he did not feel comfortable leaving the warrant with the Defendant's wife.

A copy of Tennessee Code Annotated section 16-15-604 was received as an exhibit.  Subsection (a) read,

> Original process shall be served on individuals by delivering a copy of the warrant personally . . . or if he evades or attempts to evade service . . . , by leaving a copy thereof at his dwelling house or usual place of abode with some person of suitable age and discretion then residing therein[.]

Deputy Bowers testified that the Defendant merited arrest on October 24 when he "[r]olled himself up in plastic [and] hid in a crawl space" and told his mother that he would not come to the door.  Deputy Bowers denied that the Defendant put nails in the driveway, shot at him, or prevented him from approaching the house.  Relative to the September 18 incident, Deputy Bowers stated that he told a few deputies that the Defendant drove away from him.

Defense counsel played a portion of an October 24 police cruiser video recording.[1]  In the recording, Deputy Bowers said "[he] did go that way."  Deputy Bowers denied obtaining an arrest warrant for evading.  He believed that the Defendant was preventing service of process and said that he did not know if he could have obtained a warrant for the Defendant's arrest based upon his preventing service of process.  Deputy Bowers stated that at the time he entered the Defendant's mother's house, he thought a warrant for the Defendant's arrest had been signed by an on-call judge.

Deputy Bowers identified a copy of the Defendant's arrest warrant and agreed the charge listed was "preventing or obstructing service of process."  He acknowledged that the narrative section of the warrant stated deputies had requested permission to enter the house, the Defendant's mother told them the Defendant was hiding, and the deputies searched most of the house using a police dog.  Deputy Bowers said that he was "not usually involved with arrest warrants" and that he did not know how the warrant was obtained.  Deputy Bowers stated that when a crime was being committed in a deputy's presence, the deputy did not always have to obtain a warrant.  He said that Sergeant Jenkins and Captain Norris had a conversation about "taking extra steps" to ensure they had a warrant and that Deputy Bowers was not part of the conversation.

On redirect examination, Deputy Bowers testified that if he served someone other than the named defendant, the person he served might claim he or she never received the papers.  He said that he did everything he could do to avoid involving the Defendant's parents.  He stated that he did not have permission to serve the Defendant's mother and

---

[1] The video recording, parts of which were played during the testimony of Deputy Bowers and Captain Norris, was from Deputy Greg Stanley's police cruiser.  The State introduced a redacted copy of the recording, and the complete recording was introduced by the Defendant during Deputy Stanley's testimony.

that even if she had wanted to accept service on his behalf, "I'm not going to do that. I don't care what the statute says, I'm covering my rear end." Deputy Bowers denied that frustration influenced his attempts to serve the Defendant.

On recross-examination, Deputy Bowers testified that he "followed statutes, but I followed the one I chose to choose" and that he chose not to follow the statute permitting him to serve the Defendant's wife. Deputy Bowers did not know whether the Defendant's mother volunteered to accept service on October 24. He said that Deputy Thompson eventually served the Defendant and that seven or eight deputies responded to the Defendant's mother's house.

Knox County Sheriff's Captain Wesley Norris testified that he was Deputy Bowers's supervisor and that he discussed with Deputy Bowers the difficulty of serving the Defendant. Captain Norris said that on October 24, he was concerned about the numerous times Deputy Bowers had tried to serve the Defendant and about "some safety concerns[.]" Captain Norris stated that on October 24, he spoke to Sergeant Jenkins, who was the supervisor on the scene, as well as Mike Ruble, legal counsel to the Sheriff's Office. Captain Norris said that his conversation with Mr. Ruble concerned "evasion of process, any alternative means, which had pretty much been exhausted at that point." Captain Norris stated that he made the decision to charge the Defendant with "evading service of process" because it was "obvious" that the Defendant would "go to any length to avoid being served." When asked whether the Defendant obstructed service of process, Captain Norris stated that the Defendant obstructed service by "making himself unavailable, putting other people in positions . . . [to] say he's not here or either say, he's not coming out, basically, things along those ways. Putting other people in the position to obstruct the process." When asked whether the Defendant prevented service of process, Captain Norris stated that the Defendant prevented service by refusing to accept it.

Captain Norris testified that the deputies at the scene did not have an arrest warrant and that an arrest warrant was not required when a misdemeanor occurred in a deputy's presence. When asked which misdemeanor the Defendant committed in the deputies' presence, Captain Norris responded, "Evading process." He said that the Defendant resisted arrest, although he did not see it.

Captain Norris testified that a federal lawsuit was pending as a result of the October 24 incident. He identified a copy of the federal complaint and said that it bothered him. Captain Norris read the substance of the complaint to the jury. Captain Norris stated that several parts of the federal complaint were incorrect. Captain Norris said that the federal complaint requested a $50,000 judgment for the Defendant's mother and $250,000 for the Defendant.

Captain Norris testified that the Defendant's mother said she did not want the deputies to enter her home but that no force was used. Captain Norris said he asked the Defendant questions while they stood at the back of a police cruiser. Captain Norris did not recall seeing Deputy Thompson serve the Defendant, although he was confident Deputy Thompson did. He identified Deputy Thompson's signature on the civil warrant's return. Captain Norris noted that service could have involved "informing" the Defendant because the Defendant was handcuffed and could not hold the warrant. Captain Norris agreed that service required handing a person the warrant, although he later said that service did not require handing it to a person, but rather making the person "personally aware of the service . . . face-to-face, hand-to-hand." He stated,

> Naturally, the occurrence, if I'm there to serve a paper, is to hand it, after you have been told why I'm here to serve this, whatever it is. Naturally, I'm going to hand that to you, as a copy. Is it required? I don't think it is required. You don't have to take it. I can simply drop it at your feet and walk away.

Captain Norris agreed that after Deputy Bowers determined the Defendant was "evading" process, Deputy Bowers could have dropped the warrant at the Defendant's wife's feet. He said, though, that Deputy Bowers's contact with the Defendant's wife occurred at a point in time in which the sheriff's office did not yet know whether the Defendant was evading process.

Captain Norris testified that he instructed Sergeant Jenkins to arrest the Defendant if she believed she had probable cause. He denied that Mr. Ruble told him he had probable cause to arrest the Defendant or enter the house. He denied telling Sergeant Jenkins that she had probable cause to enter the house and said that the deputy at the scene made probable cause determinations. He said that without probable cause to arrest, a deputy could not enter a house. When asked whether hiding from service of civil process gave a deputy probable cause to arrest, Captain Norris responded, "Hiding once, probably not. Hiding 24 times, maybe . . . . it's, I guess, a totality of everything that's occurred up to that point. That's where you arrive at the evading." When asked whether evading was an element of the offense, Captain Norris responded, "It's obstruction, prevention, evading. They pretty much all say the same thing to me." Captain Norris said that he thought evading was the same as obstructing or preventing and that he would have to read the statute to know whether the statute included the word "evading."

On redirect examination, Captain Norris testified that the Defendant was served at the police cruiser by telling the Defendant the contents of the civil warrant. He said that the warrant was placed in the Defendant's belongings to be transported to the jail because the Defendant was handcuffed. Captain Norris stated that if a named defendant refused to take the warrant, the serving deputy could drop it in front of the defendant. He said,

though, that the deputy could not drop it if the deputy were serving another person in the named defendant's stead.

On recross-examination, Captain Norris testified that the Defendant's wife did not have to accept the civil warrant and that service of process consisted of informing the individual of the charges, not simply leaving the warrant. Captain Norris said that handing a person the warrant "doesn't necessarily complete that process" and that the warrant was a copy of the information and "your corroboration of what I just told you." Relative to leaving the warrant with the Defendant's wife, Captain Norris responded that if a third party were reluctant to take the paper, he would not leave the paper with the third party "because I have a duty otherwise to not do it." He said that he did not know when Deputy Bowers first spoke with the Defendant's wife.

Knox County Sheriff's Sergeant Deborah Jenkins testified that she had worked in the civil warrants division for twenty years and that she was Deputy Bowers's supervisor. Sergeant Jenkins said that Deputy Bowers occasionally asked her to accompany him when trying to serve the Defendant because he had not been able to reach him several times. She stated that on one occasion, she went with Deputy Bowers to the Defendant's house and that no one answered the door. She stated that she accompanied Deputy Bowers to the Defendant's workplace once or twice before October 24, and that she spoke to the Defendant's parents. Sergeant Jenkins said that she told the Defendant's mother she needed to serve the Defendant with civil process and that she felt uncomfortable leaving the papers with his mother because his mother was "very nervous" and the location was not the Defendant's home address. Sergeant Jenkins stated that the Defendant's mother called the Defendant and that the Defendant wanted the deputies to leave because they were trespassing. Sergeant Jenkins heard the Defendant say that he was not going to make himself available to them.

Sergeant Jenkins testified that on October 24, she received a dispatch call requesting assistance from Deputy Bowers. She said that while driving to Deputy Bowers's location, she called Captain Norris to discuss Deputy Bowers's attempts to serve the Defendant. She said that Captain Norris told her to arrest the Defendant for "evasion of service" if she had probable cause to believe that the Defendant was inside the house.

Sergeant Jenkins testified that when she arrived, two deputies were speaking with the Defendant's mother at the back door. Sergeant Jenkins said that she was still speaking to Captain Norris on the telephone, that she asked Deputies Stanley and Thompson whether the Defendant was inside, and that they responded affirmatively. She said the Defendant's mother stated that she had asked the Defendant to come out but that he refused. Sergeant Jenkins stated that she could hear the Defendant and his mother talking, although she could not see him, and that the Defendant's mother begged him to

-8-

come out.  Sergeant Jenkins stated that the Defendant's mother offered to pay the debt if the Defendant would come out and the deputies would leave.

Sergeant Jenkins testified that she asked the Defendant's mother for permission to enter the house, that the Defendant's mother refused, and that Captain Norris told Sergeant Jenkins that if she had probable cause, she should go in and make an arrest for "Evasion of service, obstruction of justice."  When asked how the Defendant was obstructing service of process, Sergeant Jenkins responded, "Well, because of the history in the past . . . [when] his mother had him on the telephone and I plainly heard him say that we were trespassing, that we needed to leave, he was not going to make himself available.  That was probable cause."  When asked how the Defendant obstructed service on October 24, Sergeant Jenkins said the Defendant "ran into the business, the building there, and would not come out.  He would not make himself available . . . .  He hid.  He hid inside this building."

Sergeant Jenkins testified that she asked the Defendant's mother where the Defendant was located and that the Defendant's mother told her the Defendant was in the kitchen, living area, or bedroom.  Sergeant Jenkins stated that she and other deputies entered the house and searched the kitchen, living area, and bedroom.  She said that the Defendant's mother began "hysterically crying" and that Sergeant Jenkins attempted to comfort her.  Sergeant Jenkins stated that she went downstairs into the basement, looked around, and returned upstairs.  Sergeant Jenkins said that two deputies remained in the basement, that she did not search desk drawers, and that she did not see any other deputies search desk drawers.  She stated she saw one police dog with Deputy Ballard.  She said that she did not know where the Defendant was and that she was not present when the deputies spoke with the Defendant in the basement.  She stated that she did not usually arrest a person while serving civil process unless she knew the person had an outstanding criminal warrant.

Sergeant Jenkins testified that she wrote the Defendant's arrest warrant and that she thought the Defendant had obstructed and prevented service of process.  She stated that the Defendant did everything possible to prevent the process servers from speaking with him and that the Defendant repeatedly "escalated the situation."  She said that if the Defendant had come to the door on October 24, she probably would not have charged him.  She stated that she believed the Defendant could have been charged in connection with other incidents before October 24 and that she thought she had been patient with the Defendant.  She denied that other deputies behaved aggressively toward the Defendant.  She acknowledged that she was named in a federal lawsuit related to the October 24 incident.

On cross-examination, Sergeant Jenkins testified that she reviewed the Rules of Civil Procedure every two or three months.  She said that a person's avoiding service of process was a reason to arrest the person and that if a person avoided civil process, the

process server could leave the civil warrant at the person's residence with an adult of appropriate age and discretion. She agreed that the process server's noting the name of the person with whom the server left the warrant complied with the Rules. When asked whether a person's wife was a suitable person to receive process, Sergeant Jenkins responded that it depended on the circumstances. She said that this case was the first time she had made an arrest for "evasion of service" of process and that it was the first time "that anyone has gone to these measures."

Sergeant Jenkins testified that Captain Norris gave her a "direct order to enter the home and make the arrest" if she determined she had probable cause to believe a crime was being committed in her presence and that the Defendant was committing the crime of "evading service of process" by hiding in the house. She said the law stated she could make an arrest every time a person hid from a process server.

On redirect examination, Sergeant Jenkins testified that she believed the Defendant prevented and obstructed service when he instructed his mother to tell the deputies they were trespassing, when he told his mother he was not going to make himself available to them, and when he "made himself not available to us again" when the deputies entered the house. Sergeant Jenkins agreed that she knew the Defendant's intent was to make himself unavailable "no matter what he had to do." She said that she determined the Defendant was communicating with his mother when she was at the back door, although Sergeant Jenkins could not hear the Defendant's voice.

Knox County Sheriff's Deputy Gregory Stanley testified that on October 24, 2013, he was dispatched to the Defendant's mother's house to assist with a service of process. Deputy Stanley said that he told the Defendant's mother they were there to serve civil process. He said that he told her if the Defendant came to the door and took the warrant, the deputies would leave. He said that the Defendant's mother pleaded with someone to come out of the house and that he could not hear another person's voice.

Deputy Stanley testified that the Defendant's mother returned and told them the Defendant would not come out and that the Defendant's father, who was next door, refused to help the Defendant's mother with the situation. Deputy Stanley said that Sergeant Jenkins joined the conversation and that the three deputies entered the house because the Defendant had committed a misdemeanor in their presence "by refusing to come to the door."

Deputy Stanley testified that the deputies explained to the Defendant's mother that they had to enter the house because they did not want to force their way past her. He said that he searched the "main area" near the back door, a bedroom, and the basement and that another deputy searched the attic and the middle level.

-10-

Deputy Stanley identified photographs of the crawl space, which were received as exhibits. The photographs depicted the crawl space, a large plastic sheet, which was torn and contained a red substance, a tennis shoe, and a cell phone. He said that half of the basement had a concrete floor and that the other half was a crawl space. He stated that the crawl space had a dirt floor and a layer of plastic as a moisture barrier, that "clutter" was stored in the crawl space, and that the crawl space was accessible through a dumbwaiter door. He stated that the door was about two feet by two feet in size and that he did not generally enter such small spaces because he was a large man. Deputy Stanley said that he went upstairs and called for a K-9 deputy and his dog because entering the space would have been difficult while wearing police equipment and because it would have posed a "serious risk" to the deputies. Deputy Stanley stated that he was concerned about safety because the Defendant was familiar with the building, would have known where a weapon was located, and could have had a weapon. Deputy Stanley said that he generally assumed any suspect was armed and that the Defendant might have been in a position to assault him.

Deputy Stanley testified that he never entered the crawl space, that he loudly announced himself several times, and that he told the Defendant to come out. Deputy Stanley announced that if the Defendant failed to emerge, he would send in the police dog. Deputy Stanley said he told the Defendant the dog would bite if the Defendant resisted. Deputy Stanley stated that he heard no response, that he returned upstairs, and that he spoke to the Defendant's mother. He said that he told the Defendant's mother a police dog was en route and that he wanted to prevent anyone from being bitten. He stated that the Defendant's mother asked if he was threatening her, that he told her he was not, and that he said he was trying to prevent any harm to the Defendant. Deputy Stanley said that the Defendant's mother was overwhelmed and did not know what to do, that Deputy Stanley was concerned for her, and that he "thought it was pretty bad to do your mom this way."

Deputy Stanley testified that he went downstairs and waited about fifteen minutes for the police dog to arrive. He said that Deputy Ballard arrived and announced himself and his dog repeatedly and that the dog had a fifteen-foot leash. Deputy Stanley stated that the dog searched the right side of the crawl space, that it did not find anything, and that it returned to Deputy Ballard. Deputy Stanley said that Deputy Ballard entered the crawl space with the dog to search the left side, that Deputy Stanley heard a commotion, and that Deputy Ballard began commanding the Defendant to show his hands. Deputy Stanley stated that he saw the dog bite the Defendant's pants leg, that the Defendant held his hands underneath his body and refused to move them, and that Deputy Ballard continued to command the Defendant to show his hands.

Deputy Stanley testified that the Defendant attempted to trap and stomp the police dog's head. He said that he was concerned for the safety of Deputy Ballard and the dog because the Defendant hid his hands. Deputy Stanley said he shocked the Defendant

with his Taser but did not remember if he announced his intent to use the Taser before firing it.

Deputy Stanley testified that when he fired the Taser, Deputy Ballard immediately pulled the police dog off the Defendant to protect the dog from being shocked. Deputy Stanley said that pulling the dog away also protected the Defendant because being shocked could cause the dog to "go outside of his training" and lose control. Deputy Stanley stated that the Defendant began to comply after the second shot from the Taser. Deputy Stanley said that another deputy fired his Taser, that the Defendant threw up his hands, and that Deputy Stanley did not intend to fire his Taser at the same time as the other deputy.

Deputy Stanley testified that after the Defendant complied, Deputy Ballard and the police dog left the crawl space and that the Defendant complied with Deputy Stanley's commands about how to exit the crawl space. Deputy Stanley stated that during the altercation, the Defendant and the dog did not make any sounds. Deputy Stanley said the Defendant's silence was unusual.

Deputy Stanley testified that he handcuffed the Defendant and told him he was under arrest for "[e]vading process and resisting arrest." Deputy Stanley stated his opinion that refusing to move was "passive resistance" and constituted resisting arrest. He said that the Defendant's refusing to show his hands "put our lives in jeopardy," that the Defendant put the police dog's life in jeopardy when he attempted to harm it, and that both of these actions constituted resisting arrest.

Deputy Stanley testified that when he handcuffed the Defendant, he noticed a dog bite on one of the Defendant's arms and that the wound looked typical of a dog bite. Deputy Stanley said that he took the Defendant upstairs, that he ensured an ambulance was en route to treat the Defendant, and that he escorted the Defendant to his police cruiser. Deputy Stanley stated that the Defendant was cooperative, that the Defendant did not have any weapons, and that Deputy Stanley did not accompany the Defendant into the ambulance.

On cross-examination, Deputy Stanley testified that Sergeant Jenkins made the decision to enter the house and that before the deputies entered the house, they told the Defendant's mother, "[A]ll we want to do is give him this piece of paper." Deputy Stanley recalled that Deputy Bowers was present but could not remember whether he was at the door. Deputy Stanley said that the deputies set up a perimeter around the house to prevent the Defendant's escaping. Deputy Stanley stated that he had a "duty and obligation" to serve the Defendant. When asked whether he felt he had to serve the Defendant "at all costs," Deputy Stanley responded, "Because once he began hiding . . . he was avoiding process . . . . [Breaking] the law, yes, sir."

When asked to recite the wording of the statute he used to arrest the Defendant, Deputy Stanley responded, "He was obstructing service of process." Deputy Stanley said that the Defendant obstructed service because he was "around the corner and . . . by his inaction, refusing to come to the door and accept process . . . . [E]ventually, he chose to go in the crawl space downstairs and conceal himself in plastic" and did not respond to commands for him to come out. When asked whether the Defendant's actions before the deputies entered the house were sufficient to justify his arrest, Deputy Stanley responded, "He was committing a misdemeanor in our presence . . . [by] avoiding service of process[.]" Deputy Stanley stated that the Defendant's moving into the crawl space and concealing himself in plastic was "more than hiding." Deputy Stanley said that when the Defendant's mother spoke to someone at the door, the Defendant had to have been close because the Defendant's mother had a conversation with him, although the deputies could not hear the Defendant's voice. Deputy Stanley stated that when the deputies entered the house, the Defendant's mother began to cry.

Knox County Sheriff's Deputy Steven Ballard testified that he was the handler for Marco, his police dog, that he and the dog had worked together for three years, and that he was dispatched to the Defendant's workplace on October 24. Deputy Ballard said that he was called to assist in locating a person hiding in a crawl space. He stated that when he arrived, he harnessed his dog and attached a fifteen-foot leash. Deputy Ballard said that he and his dog entered through a back door and that he went downstairs, where Deputy Stanley explained the situation. Deputy Ballard stated that he announced himself and ordered the Defendant to come out with his hands up and that he warned the Defendant that he would be bitten. Deputy Ballard did not recall if he gave the warning multiple times, and he noted that Deputy Stanley had already given the Defendant the opportunity to surrender.

Deputy Ballard testified that he sent his dog into the crawl space, that the dog remained attached to his leash, that the dog "cleared" the right side of the crawl space, and that Deputy Ballard was unable to direct the dog toward the left side. Deputy Ballard said he entered the crawl space to redirect the dog. Deputy Ballard stated that he was uncomfortable entering the small space, that he drew his gun, and that the dog alerted to a human odor and began digging at rolled-up plastic against the foundation wall. Deputy Ballard said that he ordered the Defendant to show his hands, that the Defendant did not comply, that Deputy Ballard prompted the dog to show him the Defendant's location, and that the dog continued digging at the plastic until shoes were visible.

Deputy Ballard testified that he continued commanding the Defendant to show his hands, that the Defendant continued not to comply, and that Deputy Ballard gave his dog a command to bite the Defendant. Deputy Ballard said that although it was dark, he saw a struggle in which the Defendant hit and kicked the dog in the ribs. Deputy Ballard stated that the dog and the Defendant did not make any sounds during the struggle and that the interaction was short. Deputy Ballard said that when the Defendant began

kicking the dog, Deputy Ballard told the Defendant that he would call off the dog if the Defendant stopped kicking.

Deputy Ballard testified that he heard a Taser deployment, that he recalled his dog, that he wrapped the leash around his hand, and that he heard two subsequent Taser deployments. Deputy Ballard said that he was in the crawl space and that he continued commanding the Defendant to stop resisting and to come out. He stated that the Defendant said, "[O]kay," and that Deputy Ballard and the dog backed out of the crawl space. Deputy Ballard said that he backed up the staircase, watched the Defendant emerge, and left the building with his dog.

On cross-examination, Deputy Ballard testified that initially, he was not told the charges for which the Defendant would be arrested. Deputy Ballard said that to his knowledge, the other deputies did not locate the Defendant before he arrived. Deputy Ballard stated that he may have told Deputy Stanley he told the dog to "bite his a--."

Deputy Ballard testified that Deputy Stanley was not standing beside him in the crawl space. Deputy Ballard agreed that his dog bit the Defendant's left arm. Deputy Ballard stated that he never saw the Defendant try to hold the dog away from him. When asked whether the first Taser affected the Defendant, Deputy Ballard said that once he recalled the dog, the other two Taser deployments were simultaneous. Deputy Ballard stated that the dog was by his side before the Defendant was totally affected by the Tasers.

After the conclusion of the State's proof, the Defendant made a motion for a judgment of acquittal. The Defendant argued that the evidence was insufficient to prove that on October 24, he prevented or obstructed service of process. The Defendant noted that "prevented or obstructed" was not further defined in the statute and that the trial court had agreed to apply the normal meaning of the words. The Defendant argued that his hiding and the State's use of the words "evading" or "avoiding" did not rise to the level of preventing or obstructing. In support of his motion, he cited *State v. Harris*, 919 S.W.2d 619 (Tenn. Crim. App. 1995), for the proposition that a defendant's hiding from service of civil process did not create probable cause for an officer to search a place not open to the public. The Defendant noted that Civil Procedure Rule 4 set out an alternative means of service if a person avoided service and that the alternative means did not include obtaining an arrest warrant or searching a residence without a warrant.

The State responded that it was a jury question whether the Defendant prevented or obstructed service when he "used his physical power to prevent himself from being available to go out there," "physically walked away into that house," "placed himself" in the crawl space, concealed himself in the plastic, and refused to comply with the deputies' demands.

Relative to preventing or obstructing service, the trial court found that the Defendant was "not just hiding" because he was "not just preventing the police from knowing where he was." The court found that the police knew where the Defendant was on several occasions, "[a]nd so that's not hiding." The court found that the Defendant knew the police needed to "put something in his hand and he made sure they couldn't do that." The court found that the Defendant's actions were the equivalent to preventing the deputies from serving him because he refused to come to the door and "made it impossible for them to put that piece of paper in his hand. That's not just hiding." The court noted that the Defendant said he was not going to make himself available or cooperate with deputies in order to prevent them from serving him. The court also noted that the Defendant's possibly "wheeling out" in his truck was a "positive act." The court found that the Defendant prevented the deputies from serving process on October 24, as well as on previous occasions for which he was not charged.

Tammy Burgess,[2] the Defendant's wife, testified that she and the Defendant had been married for thirty-one years, that the Defendant worked part time with his brother's landscaping company, and that she and the Defendant had a business designing and making binoculars and telescopes. She said that the machine shop for the business was at his mother's house and that he was arrested at the machine shop.

Ms. Burgess testified that she obtained a Discover credit card in the Defendant's name, that she did not remember how she obtained the card, that she generally did not use the card, and that she decided to use the card and sign the Defendant's name without his knowledge. Ms. Burgess agreed that they received collection calls and that the Defendant did not believe he owed the credit card company.

Ms. Burgess testified that she received a letter from a local attorney indicating a civil lawsuit had been filed in connection with the credit card and that she did not tell the Defendant about the letter. Ms. Burgess denied being afraid of the Defendant and said, "I can't really explain why I don't tell him everything, but I just don't."

Ms. Burgess testified that on September 16, 2013, at 7:00 p.m., a man came to the door in connection with the civil lawsuit, yelled, and beat on the windows and door. She said that the Defendant was not home, that she was caring for her young grandson, and that she was afraid because the man sounded "crazy." She said that she reached for her cell phone to call 9-1-1 and that the man yelled he was going to call a "squad car."

Ms. Burgess testified that the man beat on at set of sliding-glass doors "like he want[ed] to break them" and yelled that he was going to call for a police dog. She said that the man went to his car for several minutes before returning to her house and that the

---

[2] Because the Defendant's wife and the Defendant's mother share the same surname, we refer to them as Ms. Burgess and Mrs. Burgess, respectively.

man told "Charlie and Whiskers to go around to the side." Ms. Burgess stated that she did not believe that the man had dogs with him because Whiskers was an unusual name for a dog. She said the man left after several minutes. She stated that she told the Defendant about the incident and that she did not recall the Defendant's taking any action.

Ms. Burgess testified that on September 25, she was preparing her grandson for school when she saw police cars in the driveway. She said that she left the house and spoke to the deputies, that she did not remember what was said, and that the deputies tried to give her a summons. She stated that Deputy Bowers was present and that he was not the deputy who attempted to hand her the summons. She said that she told the deputies she would rather not take it, that she did not wish to make the Defendant mad, that the summons was "his business," and that he probably wanted to accept it himself. Ms. Burgess stated that the Defendant would not hurt her and denied reporting to the deputies that the Defendant was violent.

Ms. Burgess testified that she did not refuse to take the summons but that she said she would rather not take it. She said that had the deputy said she had to take it, she would have accepted it. She agreed that the deputies knew she was the Defendant's wife and that the house was the Defendant's residence. Ms. Burgess stated that she was not present during the September 18 incident.

Joshua Roberts, the Defendant's coworker, testified that on September 18, he was at the Defendant's mother's house where landscaping equipment was kept. He said that the Defendant was present, that Deputy Bowers came into the shop, and that the Defendant asked if he needed help. Mr. Roberts stated that Deputy Bowers was thirty or forty feet from the Defendant, that Deputy Bowers said he needed to use the restroom, and that Deputy Bowers walked away. Mr. Roberts denied that Deputy Bowers asked for the Defendant.

On cross-examination, Mr. Roberts testified that he knew who Deputy Bowers was because the Defendant had pointed out Deputy Bowers. Mr. Roberts said that it was possible the Defendant knew Deputy Bowers was trying to contact him.

The Defendant testified that he designed and produced telescopes and binoculars and worked for his brother's commercial landscaping business. He stated that he generally left for work around 7:00 a.m. and returned between 7:00 and 8:00 p.m. He said that years before the trial, a Discover credit card representative called and left a voicemail message threatening to repossess his car and disconnect his electricity. The Defendant said that he called Discover and told them he did not have a credit card and had never used one. The Defendant stated that he asked the person to call him back with a list of the transactions but that the person did not return the call. He said that he called again one week later, spoke to the person, and considered the matter settled after the

conversation. He stated that he "just left them with, I don't want to be contacted. I don't want anybody coming to my door."

The Defendant testified that no one contacted him about the debt for years and that on an autumn day, a male sheriff's deputy came to his house asking for "Charles Burgess," which was the Defendant's son's name. The Defendant said that this incident was the first time he knew a credit card debt still existed and that the deputy did not call the Defendant by his name or serve him. The Defendant stated that he asked the deputy if this was about a Discover card and that the deputy responded he did not know. The Defendant said the deputy was not Deputy Bowers.

The Defendant testified that he first became aware Deputy Bowers was trying to serve him when he drove down his driveway and saw a black SUV blocking the entrance. The Defendant said that his son was with him, that the SUV was turned diagonally across the driveway, and that a man leaned against the front of the SUV. The Defendant stated that utility companies habitually parked in his driveway because he lived off of a rural road, that no roadside parking existed, and that the Defendant considered the SUV's presence normal. The Defendant said that he drove through the yard, that the man began to run toward him when he curved off of the driveway, and that the man was about thirty-five feet from the Defendant's truck.

The Defendant testified that he saw the man in his mirror, that the man held something in his hand, and that the Defendant thought the man had drawn a gun. The Defendant said his son thought the man held a radio or "walkie-talkie." When asked whether he intended to hit the man with his truck, the Defendant said, "No. I was just going around him like I normally do." The Defendant said that he did not know the man and that he only saw him for a second before his view was obstructed.

The Defendant identified photographs of his driveway, which were received as exhibits. The Defendant marked the location of the black SUV on one photograph. He said that in one photograph, which was taken just after the September 18 incident, he parked a van in the same location as the black SUV, although the SUV was about two feet shorter than the Defendant's van. He stated that the photograph also depicted the tire tracks he made in the grass.

The Defendant testified that later the same day, he went to his mother's house and as he walked toward the house, a man walked "through the narrow place where you can get to the back of the house." The Defendant said that he believed the man had come to buy mulch and that he asked the man if he could help him. The Defendant stated that the man stopped, said he had to use the bathroom, and turned and walked away. The Defendant said that he recognized the man's black SUV as the one parked in his driveway. The Defendant stated that his son and Mr. Roberts saw the man and that the man drove to a restaurant beside the house.

The Defendant testified that he began his work route and that his mother called and told him Deputy Bowers was there. The Defendant said he told his mother that he was out of town, that Deputy Bowers could meet him out of town, and that he would return to the house at 5:00 p.m. He stated that he told her to tell "them" to leave because they were trespassing. The Defendant said that he returned to the house before 5:00, that he waited for two hours for Deputy Bowers to return, that Deputy Bowers did not return, and that he left. The Defendant said that Deputy Bowers spoke to Ms. Burgess on September 25.

The Defendant testified that on October 24, he went to his mother's house and spoke to his parents, who were preparing to leave. He said that they saw five or six police cars pull in the driveway and that he told his mother he was going to the basement. The Defendant said that he went into the basement and that the basement had "vent doors" every ten feet, which allowed him to see and hear the police. He stated that the deputies circled the house and knocked at the back door. The Defendant said that after the deputies made a "very threatening statement" to his mother, he hid under a plastic vapor barrier.

The Defendant testified that Sergeant Jenkins came downstairs, that she was alone, and that she said, "I'm going to get you, you little s---." The Defendant said that he and his mother cried. The Defendant said that when Deputy Ballard came downstairs, the Defendant was in disbelief that the deputies threatened him with a dog. The Defendant stated that the deputies released the dog into the crawl space and that the dog bit his feet and hands. The Defendant said that Deputy Ballard was about ten feet away from him near the crawl space's access door and that Deputy Stanley was standing next to the Defendant, although the Defendant did not think Deputy Stanley was aware of it.

The Defendant testified that he did not hear any commands or conversation from Deputy Ballard's location, although he heard instructions and conversation directed at him and the dog coming from Deputy Stanley's location. The Defendant said that he held the dog away from him with his hands, that the dog twisted around and bit him, and that he had scars on his fingers and arms.

The Defendant testified that suddenly, he was shocked multiple times with Tasers. He said that the pins were fired into his leg, chest, and arm, that he dropped the dog, and that he lay still. The Defendant stated that he had never been shocked and that he could not breathe. The Defendant said that the dog "latched onto" his arm and dragged him three feet in the crawl space. The Defendant stated that Deputy Ballard did not pull the dog back until after the deputies stopped shocking him and that the dog remained near the Defendant's feet and pulled off his shoe and socks. The Defendant identified a photograph of his left ankle, which was received as an exhibit. The photograph showed blood, two large lacerations, small abrasions, and puncture wounds. The Defendant said that the wounds left scars.

-18-

On cross-examination, the Defendant testified that he and Discover reached an agreement and that he considered the matter settled years before he spoke to the other process server. The Defendant stated that the man showed him a summons and read from it, that the Defendant did not go by the name Charles, that he invited the man inside, and that the man said he could not enter the house. The Defendant said that he told the man, "[T]his better not be about a Discover card."

The Defendant testified that he told the man he had already resolved the matter with Discover. The Defendant also told the man that he told Discover he would sue if he received collection calls or anyone came to the house. The man responded that he was "just the messenger." The Defendant said that they discussed the Defendant's name not being reflected on the summons and that the man told him he was not going to have the Defendant sign it. The Defendant said the man returned to his truck, made a telephone call, returned, and spoke to the Defendant again.

The Defendant testified that on September 18, the black SUV was parked in such a manner that the rear bumper was about ten feet from the road and that the front bumper was about twenty feet from the road. The Defendant noted that the SUV "left residue" such that he was able to recreate the SUV's position in a photograph. The Defendant denied stopping when he saw the SUV blocking his driveway. He stated that for eighteen years, a tower had been located at the top of a ridge on the property and that the Defendant signed an agreement allowing six utility companies to enter his property in order to service utility lines running to the tower. He said the utility workers told him to drive around their vehicles. The Defendant denied calling the police and said his son did not think the man had a gun.

The Defendant testified that a date stamp on one of the photographs reflecting "10-30-2013" was created when he transferred the file and that the photograph was taken one or two days after the September 18 incident. The Defendant said that he became afraid and contacted the Federal Bureau of Investigation (FBI) and that Ms. Burgess told him about the previous incident in which a person beat on the door. The prosecutor noted that the Defendant's photographs reflected orange leaves on the trees but that the State's photograph did not. The Defendant said that his photographs showed more trees and different trees than the State's photograph.

The Defendant testified that September 18 was the first time he saw Deputy Bowers. The Defendant said that he saw Deputy Bowers at his mother's house and when the Defendant asked if he needed help, Deputy Bowers said he needed a restroom and drove away. The Defendant said that during the telephone conversation, his mother identified Deputy Bowers to the Defendant. He denied that his mother gave him Deputy Bowers's telephone number and told him to call Deputy Bowers. The Defendant stated that he thought it was odd that the man he saw at the end of his driveway later spoke to his mother.

The Defendant testified that he kept equipment at his mother's house, that he spent his childhood there, and that he was familiar with the basement as a hiding place. He said that he did not generally hide in the basement when he saw a police car. He stated that he was afraid and apprehensive based upon "some things" his mother told him and the incident when Deputy Bowers "pull[ed] a gun." The Defendant stated that he did not call the police after the September 18 incident and that he and Ms. Burgess performed an Internet search "on who handles police things." He said that he discovered the FBI handled the prosecution of police departments and that he contacted the FBI.

The Defendant testified that he decided to crawl under the vapor barrier after he heard five to seven deputies at the back door tell his mother they were there to arrest him. He agreed that after the deputies entered the house, they told him to come out of the basement. He said that he did not come out because he did not think they had the right to enter his workshop without a warrant. He denied wrapping himself in the plastic and said it was impossible to wrap oneself in the plastic because it was held down by rocks. He said that he went under the plastic before the deputies ordered him to come out. When asked whether he left his mother to "deal" with the deputies, the Defendant responded that he thought they would go away.

The Defendant testified that he heard a police dog come down the basement steps and that he did not see it. He agreed that when the dog approached him, he did not come out for about five seconds.

Relative to the federal lawsuit, the Defendant testified that the FBI told him that he and his mother had "a very good case" and that his version of events was contained in the complaint. The Defendant read from the federal complaint and agreed that it stated that he was trying to evade and hide from Deputy Bowers. The Defendant agreed that he was seeking $250,000 in damages from the deputies and that he "fully expect[ed]" the case to be resolved in his favor. He noted that he had permanent damage to his arm and a "blown out" eye that interfered with his binocular business. A photograph of the Defendant's arm was received as an exhibit. The photograph depicted four two- and three-inch lacerations on an upper arm. One laceration was sutured with six staples, and another was sutured with two staples.

Joseph Michael Burgess, the Defendant's son, testified that he worked for his uncle's commercial landscaping business. He said that on September 18, 2013, he and the Defendant left the Defendant's house and that when they were halfway down the driveway, they saw a vehicle parked in the driveway such that they could not go around it. He stated that a man stood at the front driver's side of the vehicle, that they began turning to go through the yard and around the vehicle, and that the man began walking toward them. Mr. Burgess denied that it was the first time the Defendant had driven through the yard. Mr. Burgess said that "about the time [the Defendant] had turned at about 90 degrees," the man lunged at the truck and stuck his hand out "to try to get in the

-20-

way." Mr. Burgess stated that the man had a walkie-talkie in his hand and that the man did not move from the truck's path. Mr. Burgess agreed that there was "plenty of room" to go around the man. Mr. Burgess denied that he and the Defendant said anything to one another about the man.

Mr. Burgess testified that when he and the Defendant pulled into the parking area at their workplace, he saw the same vehicle pull up, stop, and back up. Mr. Burgess said that he went inside and that when he came out, he saw the vehicle parked at a restaurant next door. He did not see the person in the vehicle talk to anyone. Mr. Burgess stated that the Defendant later received a telephone call from the Defendant's mother. Mr. Burgess said that they returned to their workplace between 4:30 and 6:00 p.m., although he did not remember exactly when they arrived.

On cross-examination, Mr. Burgess testified that the man in the driveway drove an SUV. He agreed that he and the Defendant did not say anything after encountering the man. Mr. Burgess denied seeing a man wearing a sheriff's uniform approach the Defendant with a piece of paper later the same day.

Richard Bean, the operations manager for the Defendant's brother's landscaping company, testified that he was the Defendant's friend and brother-in-law. He said that sometime after September 18, he met Deputy Bowers, that Deputy Bowers asked if the Defendant was there, and that Mr. Bean told Deputy Bowers he was not. Mr. Bean stated that Deputy Bowers told him to tell the Defendant that he needed "take care of this summons, because if he doesn't, I'm going to get him."

Margaret Grace Burgess, the Defendant's mother, testified that she saw Deputy Bowers and a female deputy walk into her yard from the parking lot of a restaurant, that Mrs. Burgess spoke to Deputy Bowers, and that as a result of their conversation, she telephoned the Defendant to tell him Deputy Bowers was there. Mrs. Burgess said that the Defendant told her he was out of town but would return and meet with Deputy Bowers around 5:30 p.m. She stated that she relayed the message and that she had the impression Deputy Bowers was going to meet with the Defendant. She said that the Defendant returned about 5:30 or 6:00 p.m. and waited for Deputy Bowers for "several hours."

Mrs. Burgess testified that on October 24, five police cruisers pulled into her driveway, three additional police cruisers parked at the restaurant next door, and unmarked cars parked in her backyard. Mrs. Burgess stated that deputies knocked abruptly on her back door and that when she answered the door, she told them the home was hers. She said that she thought the police were intruding on her home. She stated that deputies were everywhere and that she did not want them to come inside. She said that she did not give them permission to enter, that they entered anyway, and that she counted six deputies. Mrs. Burgess stated that the deputies searched her entire house,

opened and searched her closets and shower, and scared her dogs. She said that the deputies did not show her any documents and that a large police dog was taken to the basement. She stated that when the police were at the door, she attempted to talk to the Defendant and that although she heard his voice, she could not see him.

On cross-examination, Mrs. Burgess testified that the Defendant did not go to the basement until after the police arrived. She said that she asked the Defendant to come out and that she knew the Defendant heard her because he answered her.

Upon this evidence, the Defendant was convicted of obstructing service of process, preventing service of process, and preventing or obstructing an arrest. The trial court merged the obstructing and preventing service of process convictions and sentenced the Defendant to six months' supervised probation and service of ten days in jail.

## I. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. The State responds that the evidence is sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

### a. Obstructing or Preventing Service of Process

Relative to the convictions for preventing and obstructing service of process, the Defendant argues that hiding is not criminal behavior as contemplated by the statute. The State responds that the Defendant did more than simply "evade" process because he used "his workshop and mother to hinder service efforts and [hid] to impede the officers."

Tennessee Code Annotated section 39-16-602(c) (2014) states that "[it] is an offense for a person to intentionally prevent or obstruct an officer of the state . . . in serving, or attempting to serve or execute, any legal writ or process." Whether an overt act is required to constitute obstructing or preventing service is an issue of first impression.

In construing a statute, this court must ascertain and give effect to the legislative intent without unduly restricting or expanding the statute beyond its intended scope. *State v. Strode*, 232 S.W.3d 1, 9 (Tenn. 2007). The words in the statute must be given their natural and ordinary meaning in light of their statutory context. *Keen v. State*, 398 S.W.3d 594, 610 (Tenn. 2012). "[A]ny forced or subtle construction that would limit or extend the meaning of the language" must be avoided. *Id.* (citation omitted). "If the statutory language is clear and unambiguous, we apply the statute's plain language in its normal and accepted use." *Id.*; *see State v. Gibson*, 506 S.W.3d 450, 455-56 (Tenn. 2016).

Merriam-Webster defines "obstruct" as "to block or close up by an obstacle," or "to hinder from passage, action, or operation: impede." *Obstruct*, THE MERRIAM-WEBSTER DICTIONARY (New ed. 2016). "Prevent" is defined as "to deprive of power or hope of acting or succeeding" or "to keep from happening or existing." *Prevent, id.* "Evade" is defined as "to slip away" or "to take refuge in escape or avoidance." *Evade, id*. Although hiding by its nature makes service of process difficult, we do not think the common understanding of "obstruct" and "prevent" includes mere concealment in the absence of an overt act against an officer serving process. Hiding is more appropriately categorized as a form of evading or avoiding.

A commonsense reading of Code section 39-16-602 leads us to conclude that the legislature did not intend to criminalize merely evading or avoiding civil process servers. We note that throughout the trial and this appeal, the State and its witnesses referenced the Defendant's placing the sheet of plastic over him, placing the house between the Defendant and the deputies, and placing his mother between the Defendant and the deputies as overt acts by which he "prevented" the deputies from reaching him. However, the Defendant had no legal obligation to facilitate service of process or otherwise cooperate with the deputies by accepting service of process. The Defendant was inside a private residence and chose not to engage with the deputies, who had other means of effecting service of process available to them but elected not to pursue them. His actions did not foreclose the deputies' opportunity to serve him and merely constituted a lack of cooperation with the deputies' chosen method of service of process. Further, the extraordinary measures taken by the deputies offer some explanation for the Defendant's not being inclined to cooperate with them—the large number of deputies who responded to serve a civil warrant, a warrantless intrusion into a private residence by those deputies, the presence of a police dog to serve a civil warrant, and threats that the dog would bite the Defendant amply explain the Defendant's actions.

We also find *State v. Harris*, 919 S.W.2d 619, 623 (Tenn. Crim. App. 1995), to be instructive. In *Harris*, this court held that even if a sheriff believed a person were hiding from a process server, the sheriff was not justified in entering the curtilage of a home without a warrant. The court noted that "nothing justifies the sheriff's proceeding [into the curtilage] to serve civil process even if the sheriff had believed that [the defendant] [were] 'hiding' from service" and that Tennessee Civil Procedure Rule 4 governed the procedure to be followed if a person evaded service. *Id.* The court specifically noted that, as in the present case, no evidence had established that the defendant intentionally prevented or obstructed the officers who came to serve the civil warrant. *Id.* As a result, we read *Harris* to limit the methods of service available to officers to those specified by Rule 4 and Code section 16-15-903(1) when an individual evades or attempts to evade service of civil process.

Tennessee Civil Procedure Rule 4, as codified by Tennessee Code Annotated section 16-15-903(1) (2014), provides that civil service

> shall be made . . . [u]pon an individual . . . by delivering a copy of the warrant, writ or other papers to the individual personally, or if the individual evades or attempts to evade service, by leaving copies of the warrant, writ or other papers at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing in the dwelling house or usual place of abode, whose name shall appear on the proof of service[.]

The deputies' misunderstanding of the elements of the offense notwithstanding, the record reflects in the light most favorable to the State that the conduct each State's witness described was mere avoiding or evading service. The Defendant retreated to the basement when the deputies knocked on the door, and Mrs. Burgess told the deputies he refused to come out and speak to them. When the deputies entered the home without a warrant, the Defendant was found lying beneath or rolled in a sheet of plastic. The evidence also reflects that the deputies unsuccessfully attempted personal service more than twenty times and that as a result, they could have determined the Defendant was evading or avoiding service of process and left the summons and civil warrant with the Defendant's wife pursuant to Civil Procedure Rule 4. However, the deputies chose not to serve her in accordance with the Rule. The Defendant simply declined to cooperate with a process server, which is not a criminal offense.

In rendering this conclusion, we have also considered the statutory context of the Code section at issue. Code section 39-16-602(a) prohibits preventing or obstructing an officer from effecting an arrest and mirrors the language of subsection (c), although subsection (a), unlike subsection (c), requires force to be used against a law enforcement officer. The legislature enacted a separate statute, Code section 39-16-603, to prohibit a

-24-

person's evading arrest.[3] Notably, the legislature did not include language criminalizing evading service of process in either the evading arrest statute or in Code section 39-16-602(c), evidencing its intent to exclude evading service of process from being categorized as a criminal offense. In addition, the existence of alternate methods of service for a named defendant determined to be evading service articulated in Civil Procedure Rule 4, when read in conjunction with Code sections 39-16-602 and -603, indicates that the legislature was aware of evasion of service as a possible behavior and declined to create an affirmative duty on the part of civilians to facilitate their being served with civil process. Again, a lack of cooperation in accepting service of process is not a criminal offense.

We conclude that the Defendant's actions on October 24 did not rise to the level of preventing or obstructing an officer in service of process, and we reverse his convictions in Counts 1 and 2, vacate the convictions, and dismiss the charges.

*b. Preventing or Obstructing an Arrest*

Relative to his conviction for preventing or obstructing an arrest, the Defendant argues that he acted in self-defense and that the deputies used excessive force to effectuate the arrest. The State responds that the Defendant used force against the police dog, an instrumentality of the police, and therefore prevented or obstructed his arrest.

Tennessee Code Annotated section 39-16-602(a) states that "[it] is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer . . . from effecting a[n] . . . arrest . . . by using force against the law enforcement officer or another." Code section 39-16-602(b) states, "Except as provided in § 39-11-611, it is no defense to prosecution under this section that the . . . arrest . . . was unlawful." "Passive resistance" generally does not constitute using force as contemplated by the preventing or obstructing an arrest statute. *See State v. Corder*, 854 S.W.2d 653, 655 (Tenn. Crim. App. 1992), (concluding that a defendant's not moving and directing obscene language at officers were not sufficient to support a conviction for resisting arrest); *see also* Tenn. Op. Att'y Gen. 00-147, 2000 WL 159391 (Sept. 26, 2000) (articulating that passive inaction, specifically sitting in a car and refusing to exit, was not resisting arrest).

As a preliminary matter, we do not agree with the State's assertion that a "plain reading" of Code section 39-16-602(a) prohibits a defendant from using force against "an instrumentality" an officer uses to effectuate an arrest. The State relies upon *Robinette v. Barnes*, 854 F.2d 909 (6th Cir. 1988), and *State v. Jose Roberto Ortiz*, No. M1998-00483-CCA-R3-CD, 1999 WL 1295988 (Tenn. Crim. App. Dec. 30, 1999), *perm. app.*

---

[3] We note that the legislature amended Code section 39-16-603 to include the word "conceal," effective July 1, 2016.

*denied* (Tenn. Sept. 25, 2000). However, the cited cases only state that police dogs are legitimate law enforcement tools and do not determine whether using force against a police dog is contemplated under the preventing or obstructing an arrest statute.

The record reflects that the indictment for Count 3, preventing or obstructing an arrest, states that the Defendant used force against "law enforcement officers." Tennessee Code Annotated section 39-11-106(a)(21) (Supp. 2011) (amended 2014) defines a law enforcement officer as "an officer, employee or agent of government who has a duty imposed by law to . . . maintain public order . . . [or] make arrests for offenses . . . [and] investigate the commission or suspected commission of offenses." [4]

As the State notes in its brief, our courts have acknowledged the use of police dogs as a legitimate law enforcement tool. However, neither our courts nor our legislature have adopted the concept that a police dog is the equivalent to a human law enforcement officer. For example, in *State v. Kenneth Hayes*, No. W2010-00309-CCA-R3-CD, 2011 WL 3655130, at *1 (Tenn. Crim. App. Aug. 19, 2011), *perm. app. denied* (Tenn. Nov. 16, 2011), a defendant repeatedly stabbed a police dog but was not prosecuted for aggravated assault or attempted murder, but rather "attempt to commit the intentional killing of an animal worth over $1000[.]" Similarly, if a person killed a police dog, the person could be prosecuted under Tennessee Code Annotated section 39-14-205 (2010) (amended 2015), which appears in the "Offenses Against Property" chapter of the Code and governs the killing of any animal belonging to a person. In addition, the punishment for such an offense is governed by the dog's value, as indicated by an internal citation to the theft statute. *See id.*; *see also id.* § 39-14-105 (Supp. 2012) (amended 2016, 2017). Our legislature has not evidenced an intent to include police dogs in the definition of law enforcement officers based on the plain language of the relevant statutes. *See Keen*, 398 S.W.3d at 610; *Gibson*, 506 S.W.3d at 455-56.

The record reflects that, in the light most favorable to the State, the Defendant's kicking the police dog was the only time he used force in the crawl space, which was presumably to defend against the dog's complying with an order from Deputy Ballard to bite the Defendant. Because the dog was not a law enforcement officer, and no evidence was presented to suggest the Defendant used force against any of the numerous deputies involved in this case, the evidence is insufficient to support the Defendant's conviction for preventing or obstructing an arrest. We reverse the judgment of the trial court relative to Count 3, preventing or obstructing an arrest, vacate the conviction, and dismiss the charge.

---

[4] We note that the jury instructions, which were attached to the Defendant's brief but not included in the appellate record, tracked the statutory language. The Defendant should have sought to supplement the record with the jury instructions if he intended to reference them in his brief. We note that the Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g., State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); T.R.A.P. 24(b).

In consideration of the foregoing and the record as a whole, we reverse the judgments of the trial court, vacate the Defendant's convictions, and dismiss the charges.


_____
ROBERT H. MONTGOMERY, JR., JUDGE