854 F.2d 909
 102 A.L.R.Fed. 605, 57 USLW 2162
 Dorothy ROBINETTE, Administratrix of the Estate of Daniel
Briggs, deceased, Plaintiff-Appellant,
v.
Ronnie BARNES, individually and as employee of Metropolitan
Government of Nashville and Davidson County, Tennessee; Joe
Casey, Chief, in his official capacity as Chief of
Metropolitan Police Department for Metropolitan Government;
and Metropolitan Government of Nashville and Davidson
County, Tennessee, Defendants-Appellees.
 No. 86-6135.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 21, 1987.
Decided Aug. 22, 1988.
 
 Thomas W. Goodman, Jr. (argued), Pikeville, Ky., for plaintiff-appellant.
 Mary S. Foust (Lead counsel), Nashville, Tenn., James L. Charles (argued), Mark C. Scruggs, for defendants-appellees.
 Before GUY and BOGGS, Circuit Judges, and SUHRHEINRICH, District Judge.*
 BOGGS, Circuit Judge.
 
 
 1
 A man suspected of being in the course of a commercial burglary, hiding inside a darkened building, was apprehended by a police dog who bit him on the neck. The suspect died shortly thereafter. For the reasons which follow, we agree with the district court that the use of a properly trained police dog to seize a felony suspect does not constitute deadly force. We also hold that even if the use of a police dog could constitute deadly force, the circumstances of the suspect's apprehension justified the use of such force in this case. Thus, we affirm the award of summary judgment in favor of defendants.
 
 
 2
 * Since 1972, defendant-appellee, Metropolitan Government of Nashville and Davidson County (Metro), has maintained within its police department a "K-9" division consisting of teams of officers and police dogs. Each officer-dog team is trained according to guidelines established by the United States Police Canine Association (USPCA), a national organization. Building searches are among the law enforcement tasks the "K-9" teams are trained to perform.
 
 
 3
 Defendant-appellee, police officer Ronnie Barnes, and his police dog, Casey, completed an initial training program in June 1981. Since at least January 1984, they have participated in a retraining program which requires that the proficiency of each "K-9" team be reevaluated every three weeks. Building search procedure is among the skills reevaluated.
 
 
 4
 According to the head of Metro's "K-9" division, Lieutenant Charles Spain, the dogs are trained to track and apprehend suspects when they hear the voice command, "Find him." Spain emphasized that the dog is trained to apprehend a person by seizing an arm. However, he also stated that if a suspect's arm is not available, the dog will "get the first thing that [is] offered to him."
 
 
 5
 Shortly after midnight on July 10, 1984, the "K-9" team of Barnes and Casey was summoned to the Superb Motors car dealership in Nashville, Tennessee. A burglar alarm inside the building had been activated. According to the district court, by the time Barnes arrived at the dealership, "[o]fficers already on the scene had located a point of entry, a broken glass door, and had seen a suspect inside the building looking out at them." Barnes and another officer stated in depositions that while they were outside the building, they saw a white male inside of it.
 
 
 6
 Barnes and Casey entered the building and stood in a small entry room. Barnes shouted a warning that he had a police dog and that anyone inside the building should come out or he would turn the dog loose. Approximately thirty seconds later, Barnes repeated the warning. After another thirty seconds passed, Barnes released Casey. The dog ran to a closed door at one end of the room. Barnes opened the door for the dog. According to his deposition, "[t]he dog took a few steps out there and I shouted again, You'd better come out. Then the dog turned around and came back to me...."
 
 
 7
 As soon as Casey returned, Barnes gave the command, "Find him." Barnes and the dog then began to search the building. The dog ran ahead of Barnes while the officer checked some closed doors that Casey bypassed. Eventually, Barnes followed Casey into a darkened bay area of the car dealership. His flashlight revealed that Casey had the suspect's neck in his mouth. The man was lying face down on the floor with half of his body underneath a car. He did not move. A substantial amount of blood had collected around him and more was oozing from his neck.
 
 
 8
 Barnes ordered Casey to come to him, leashed the dog and then called for an ambulance. The suspect, Daniel Briggs, was pronounced dead on arrival.
 
 
 9
 Dorothy Robinette, the administratrix of Briggs's estate, sued Barnes, Metro, and the Chief of Metro's police department, Joe Casey,[1] under 42 U.S.C. Sec. 1983. On August 12, 1986, the district court, concluding, inter alia, that the use of the police dog did not constitute deadly force, granted the defendants' motion for summary judgment. After the district court issued a final order "disposing of all claims nunc pro tunc," Robinette filed this appeal. She renews her claim that the use of a police dog to apprehend Briggs constitutes unnecessary deadly force which deprived him of his fourth and fourteenth amendment rights.[2]
 
 II
 
 10
 The Supreme Court held in Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), that the apprehension of a criminal suspect "by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Garner, 471 U.S. at 7, 105 S.Ct. at 1699. Although the Court elaborated on the factors relevant for an assessment of a seizure's reasonableness, the Court did not expressly define what constitutes deadly force.
 
 
 11
 In Garner, a police officer seized an unarmed, fleeing burglary suspect when he shot and killed him. Thus, the deadly force in issue in that case was the kind which undoubtedly comes to mind first, a firearm. However, many law enforcement tools possess the potential for being deadly force, including a state university police officer's nightstick, Dugan v. Brooks, 818 F.2d 513, 516-17 (6th Cir.1987), and a police officer's vehicle, Galas v. McKee, 801 F.2d 200, 203 (6th Cir.1986). Indeed, as any faithful reader of mystery novels can attest, an instrument of death need not be something as obviously lethal as a gun or knife. The ubiquitous "blunt object" kills just as effectively.
 
 
 12
 Thus, whether deadly force has been used to seize a criminal suspect must be determined in the context of each case. The Model Penal Code drafted by the American Law Institute acknowledges this fact by proposing the following definition:
 
 
 13
 "deadly force" means force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm. Purposely firing a firearm in the direction of another person or at a vehicle in which another person is believed to be constitutes deadly force. A threat to cause death or serious bodily harm, by the production of a weapon or otherwise, so long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute deadly force.
 
 
 14
 Model Penal Code Sec. 3.11(2) (Proposed Official Draft 1962). We find this definition a useful statement of the two factors most relevant to the determination of whether the use of a particular law enforcement tool constitutes deadly force: the intent of the officer to inflict death or serious bodily harm, and the probability, known to the officer but regardless of the officer's intent, that the law enforcement tool, when employed to facilitate an arrest, creates a "substantial risk of causing death or serious bodily harm."
 
 
 15
 Applying these factors to the present case, we conclude that Barnes did not employ deadly force to apprehend Daniel Briggs on July 10, 1984, when he commanded his police dog, Casey, to search for Briggs in the Superb Motors building. There is no indication from the evidence that Barnes intended Briggs to die or suffer serious bodily harm, or that Barnes in any way deviated from the proper procedures for conducting a building search with a police dog.
 
 
 16
 More importantly, we find that the use of a properly trained police dog[3] to apprehend a felony suspect does not carry with it a "substantial risk of causing death or serious bodily harm." Although we cannot ignore the fact that, in this case, the use of a police dog did result in a person's death, we also cannot ignore the evidence in the record which indicates that this tragic event was an extreme aberration from the outcome intended or expected. Lieutenant Spain's deposition testimony was unequivocal on the fact that the dogs are trained to seize suspects by the arm and then wait for an officer to secure the arrestee. While it is impossible to know for certain what happened when Casey found Briggs in the bay of the car dealership, the conclusion compelled by the evidence is that when the dog found the suspect, he was hidden underneath a car, his arms were not within the dog's reach and, unfortunately, his neck was. Since the dog had been trained to seize whatever part of anatomy was nearest if an arm was unavailable, the dog acted consistent with its training by seizing Briggs's exposed neck. Given the remote chance that this particular scenario would occur, we cannot conclude that Barnes released the dog with the knowledge that by doing so, he was creating "a substantial risk" that the dog might kill Briggs.
 
 
 17
 Lieutenant Spain stated that to his knowledge, no trained police dog has ever killed an individual before these events occurred. Corroborating this statement is Barnes's deposition testimony that the records of the USECA, which have been maintained for over 20 years, also indicate that this is the first time a person has died as a result of being apprehended by a police dog. These statements, along with the fact that our own research has failed to reveal any reported case involving similar circumstances, lead us to conclude that when a properly trained police dog is used in an appropriate manner to apprehend a felony suspect, the use of the dog does not constitute deadly force. While an officer's intent in using a police dog, or the use of an improperly trained dog, could transform the use of the dog into deadly force, we find no such intent or improper training present in this case.
 
 
 18
 We do not dispute the fact that trained police dogs can appear to be dangerous, threatening animals. The dogs' ability to aid law enforcement would be minimal if they did not possess this trait. However, the mere recognition that a law enforcement tool is dangerous does not suffice as proof that the tool is an instrument of deadly force. As we already have stated, the totality of the factors present in a particular case determine whether deadly force was used to apprehend a suspect. Accordingly, we affirm the district court's conclusion that, although in this particular case the use of a police dog to apprehend a suspected felon resulted in that felon's death, deadly force was not used to seize the felon.
 
 III
 
 19
 We also hold that even if we were to conclude that the use of a police dog to apprehend a suspected felon constitutes deadly force, the use of such force to seize Daniel Briggs was not unreasonable under the circumstances. The Court made it clear in Garner that the use of deadly force to apprehend a felony suspect is not per se an unreasonable seizure under the Constitution. Rather, the Court held that "[t]o determine the constitutionality of a seizure, '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " Garner, 471 U.S. at 8, 105 S.Ct. at 1699 (quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)). Thus, the Court concluded that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Id. at 11, 105 S.Ct. at 1701.
 
 
 20
 When we engage in this balancing analysis in light of the events which occurred at the Superb Motors car dealership in Nashville on July 10, 1984, we conclude that the circumstances warranted the use of deadly force. The facts indicate that Barnes had probable cause to believe that Briggs, a suspected felon[4] hidden inside a darkened building in the middle of the night,[5] threatened his safety and the safety of the other officers present. As the district court succinctly put it,
 
 
 21
 a reasonably competent officer would believe that a nighttime burglary suspect, who, the officers had good reason to believe, knew the building was surrounded, who had been warned ... that a dog would be used, and who gave every indication of unwillingness to surrender, posed a threat to the safety of the officers.
 
 
 22
 Unlike the situation in Garner, this is not a case where a police officer shot a fleeing felon, a criminal suspect who, at least in part because of the fact he was fleeing, posed no threat to the officer. Instead, this is a case where an officer was forced to explore an enclosed unfamiliar area in which he knew a man was hiding. Under the totality of the circumstances, Barnes was justified in using whatever force was necessary, even deadly force, to protect himself and the other officers and to apprehend the suspect.
 
 
 23
 In assessing the reasonableness of the use of police dogs in light of the possibility that the use of the dogs constitutes deadly force, we are mindful that in Garner the Court noted that it would be hesitant "to declare a police practice of long standing 'unreasonable' if doing so would severely hamper effective law enforcement." Garner, 471 U.S. at 19, 105 S.Ct. at 1705. Because the evidence establishes that there is not a substantial risk that the use of a police dog to apprehend a criminal suspect could result in the suspect's death, we too are hesitant to label "unreasonable" a police practice which has proven useful in a variety of law enforcement situations.[6]
 
 
 24
 Indeed, instead of generally causing deadly force to be used to apprehend criminals, we believe that these dogs often can help prevent officers from having to resort to, or be subjected to, such force. Any attempt to apprehend a criminal suspect presents the officer with difficult and frightening situation, but certainly an attempt to arrest a suspect hidden inside an unfamiliar building during the nighttime presents a particularly confusing one. The use of dogs can make it more likely that the officers can apprehend suspects without the risks attendant to the use of firearms in the darkness, thus, frequently enhancing the safety of the officers, bystanders and the suspect.
 
 
 25
 Accordingly, we are not persuaded by the evidence presented that the remote possibility that the use of a police dog to apprehend a felon might, under extraordinary circumstances, cause death, outweighs the dogs' proven benefits for effective law enforcement.
 
 IV
 
 26
 For the foregoing reasons, the decision of the district court awarding summary judgment in favor of defendants-appellees is AFFIRMED.
 
 
 
 *
 The Honorable Richard Suhrheinrich, District Judge of the United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The district court granted Chief Casey's motion to dismiss him from the case on the ground that since the chief is sued only in his official capacity, and his public employer, Metro, is named defendant, "[t]here is no procedural or remedial advantage to plaintiff in continuing defendant [Chief] Casey's presence in this lawsuit." Brandon v. Holt, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Chief Casey's dismissal has not been appealed
 
 
 [2]
 In a decision recently issued by this court, we noted that the Seventh Circuit has decided "that in excessive force cases the only analysis should be under the Fourth Amendment and not the Fourteenth Amendment. Lester v. City of Chicago, 830 F.2d 706 (7th Cir.1987)." Kuhar v. Hanton, 836 F.2d 1348 (6th Cir.1988). We will not address this issue because, as was the case in Kuhar, "it is not specifically raised by the parties nor is its resolution necessary to our decision in this appeal." Ibid
 
 
 [3]
 An expert witness for the plaintiff has suggested that Casey may have been improperly trained. As the district court correctly states, "[i]f the improper training was the result of simple negligence, no section 1983 action will lie...." See, e.g., Jones v. Sherrill, 827 F.2d 1102, 1106 (6th Cir.1987). Although a section 1983 action might lie if Casey's training had been intentionally altered, the record is devoid of any evidence which would support such a finding in this case
 
 
 [4]
 Burglary of a business establishment is a felony under Tennessee law. Tenn.Code Ann. 39-3-404, 39-1-103 (1982)
 
 
 [5]
 Many jurisdictions impose more severe criminal penalties for burglaries committed during the nighttime than for burglaries committed during daylight hours. See generally 13 Am.Jur.2d Burglary Secs. 27-28 (1964). Although one explanation for this phenomenon could be that at common law, an essential element of the crime of burglary was that the crime had to have been committed during the nighttime, Id. at Sec. 22, another likely reason is the recognition by legislatures that darkness makes both citizens and police officers more vulnerable to the burglar and can heighten the criminal's opportunity for escape
 
 
 [6]
 For example, besides being used to track and apprehend criminals, police dogs are well-known for their ability to detect drugs and, thus, have been instrumental in achieving a number of drug-trafficking convictions. See, e.g., United States v. Restrepo-Rua, 815 F.2d 1327 (9th Cir.1987); United States v. Saperstein, 723 F.2d 1221 (6th Cir.1983); United States v. MacDonald, 670 F.2d 910 (10th Cir.), cert denied, 459 U.S. 1015, 103 S.Ct. 373, 74 L.Ed.2d 508 (1982). We also note that Metro uses the dogs to locate missing persons and lost or abandoned articles