**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0194n.06

Case Nos. 18-5177/5179

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| WILLIAM CHARLES BURGESS and GRACE BURGESS, | ) ) ) | **FILED**<br>Apr 16, 2019<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellees, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| v. | ) ) ) |  |
| CHUCK BOWERS, JR., WESLEY G. NORRIS, DEBBIE JENKINS, STEPHEN A. BALLARD, GREGORY H. STANLEY, and DAVID THOMPSON, | ) ) ) ) ) | **OPINION** |
| Defendant-Appellants, | ) ) |  |

BEFORE: BOGGS, KETHLEDGE, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. Officers with the Knox County Sheriff's Department entered Grace Burgess's home without a warrant to search for and arrest her son, William Burgess. The officers believed they had probable cause to arrest William because he had been evading their attempts to serve him process for weeks. They eventually found William hiding inside a crawlspace within the basement, but because William failed to heed their repeated warnings to come out, they deployed a canine to apprehend him. When that did not work, they tased him three times, which incapacitated him and allowed the officers to arrest him.

Grace and William ("the Burgesses") subsequently brought this § 1983 action asserting state and federal claims against the officers. After the officers moved for summary judgment, the district court denied them qualified immunity, and this appeal followed. For the following reasons,

we AFFIRM in part, REVERSE in part, VACATE in part, and REMAND for proceedings consistent with this opinion.

I

Officer Chuck Bowers attempted to serve civil process on William Burgess several times over several weeks to no avail. As William put it, he had been "evading and hiding" from Bowers to avoid being served. [R. 1, Compl. at PageID #2 ¶ 5.] One day, Bowers attempted to serve William at his mother's home, which he also uses as a business address. The Burgesses operate a landscaping business near the house called Turf Masters.

After learning from an employee that William was on the property, Bowers called for backup, so Officer Debbie Jenkins and other officers were dispatched to assist him. While on her way, Jenkins called her supervisor, Captain Wesley Norris, who advised her that she could enter the property if she had probable cause to make an arrest for evasion of process or obstruction of justice.

Upon her arrival, Jenkins made her way to the back of the house where she found Officers Stanley and Thompson speaking to William's mother, Grace Burgess. Stanley and Thompson told Jenkins that they could hear Grace speaking back and forth with William, begging for him to come out, and that he was refusing.

When Grace confirmed that William was inside, Jenkins believed she had probable cause to enter the house and arrest him. Over Grace's objection, Jenkins entered the house with Thompson, and together they searched the main level of the house. At some point, Officer Ballard also arrived on the scene and, together with Stanley and Thompson, found William hiding in the crawlspace of the basement underneath a vapor barrier. The officers repeatedly commanded William to come out, but he refused, so Ballard sent a canine to apprehend him. When William

attempted to fight off the dog, Stanley and Thompson tased him three times.[1] The officers' tasers rendered William unable to defend himself from the canine, which continued to bite him, leaving him with permanent injuries. Thereafter, the officers arrested William.

A grand jury indicted William on one count of preventing and obstructing an arrest and on two separate counts of preventing and obstructing civil service of process in violation of T.C.A. § 39–16–602—all class B misdemeanors. While William's criminal trial was pending, he and Grace filed this § 1983 action against the officers. In their complaint, they asserted Fourth Amendment unreasonable-search-and-seizure claims along with aggravated-assault and false-arrest claims under Tennessee law.

William was convicted after a jury trial, although his conviction was eventually overturned on appeal. *See State v. Burgess*, 532 S.W.3d 372 (Tenn. Crim. App. 2017). Meanwhile, the parties had submitted several filings in this action in which they moved for certain relief and simultaneously responded to previous filings.[2] These filings culminated in the officers' renewed motion to dismiss based on collateral estoppel and their supplemental motion for summary judgment based on qualified immunity. The district court granted the officers qualified immunity on William's state-law claim of false arrest. But it denied the officers qualified immunity with respect to the Burgesses' Fourth Amendment unreasonable-search-and-seizure claims. The court also denied the officers' renewed motion to dismiss.

This appeal followed.

---

[1] On appeal, William asserts that he was "effectively" tased five times. But in his complaint and in his response to the officers' motion for summary judgment, he asserted he was tased three times. And that is consistent with his trial testimony.

[2] *See* R. 70, Op. and Order at PageID #1119–20 for a list of these filings.

II

"Qualified immunity shields government officials from standing trial for civil liability in their performance of discretionary functions unless their actions violate clearly established rights." *Thompson v. City of Lebanon*, 831 F.3d 366, 369 (6th Cir. 2016) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once an official invokes the defense of qualified immunity in a § 1983 action, the plaintiff bears the burden of overcoming the defense. "At the summary judgment stage, the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *Id.* (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)).

Ordinarily, we may not review a district court's denial of summary judgment because we only have jurisdiction to hear appeals from final decisions. *See* 28 U.S.C. § 1291. "In the context of a denial of qualified immunity, however, a denial of summary judgment may be treated as final under § 1291." *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). But our review is circumscribed by the interlocutory posture of the appeal. We have jurisdiction to review the pure legal question of whether "the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a prima facie violation of clear constitutional law." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998). With limited exceptions, however, we may not review the district court's determinations of "which facts a party may, or may not, be able to prove at trial." *Johnson v. Jones*, 515 U.S. 304, 313 (1995).

III

*Grace's Unreasonable-Search Claim.* The officers argue that the district court erred in denying them qualified immunity on Grace's unreasonable-search claim because she "produced no cases clearly establishing that a warrant is required to enter a building that is open to the public for the sale of mulch but also serves as a residence." [Bowers Opening Br. at 24.] But the parties

vigorously contest whether, in fact, Grace's home contains a mulch shop that is open to the public or whether, instead, the shop is located in a separate building. This is quintessentially the type of factual dispute we lack jurisdiction to review on appeal from a district-court order denying qualified immunity. *See Johnson*, 515 U.S. at 313.

What the parties (and the district court) agree on is that the building is Grace's home. As a result, our analysis of Grace's unreasonable-search claim is straightforward. Absent exigent circumstances, officers violate a person's rights if they enter her home without a warrant or her consent solely to execute an arrest warrant for another person. *See Steagald v. United States*, 451 U.S. 204, 213–14 (1981). Much less, it follows, may officers enter her home to make an arrest with no warrant at all. Thus, a "third party homeowner" whose home is invaded to arrest someone else "may . . . pursue a civil action alleging that the entry into his home without a search warrant violated his civil rights." *United States v. Buckner*, 717 F.2d 297, 300 (6th Cir. 1983).

Here, the officers knew that the building was used as Grace's home. They further admit that they lacked both a warrant and her consent to enter her home. And it is undisputed that there were no exigent circumstances justifying their warrantless entry. Moreover, before the officers searched Grace's home, we had already held that a warrantless entry into a person's home to arrest someone else for a misdemeanor violates clearly established rights. *See Smith v. Stoneburner*, 716 F.3d 926, 933 (6th Cir. 2013). Hence, the officers had "fair warning" that their "forced warrantless entry" violated clearly established law. *See Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005).

Alternatively, the officers argue that they are entitled to qualified immunity because they were operating in accordance with counsel's advice when they conducted their warrantless search of Grace's home. Specifically, the officers contend that the sheriff's chief legal counsel advised

Norris, who advised Jenkins, that Jenkins could enter Grace's home if she had probable cause to make an arrest for evasion of service of process or obstruction of justice. But our circuit "has determined that reliance on counsel's legal advice constitutes a qualified immunity defense only under extraordinary circumstances." *Silberstein v. City of Dayton*, 440 F.3d 306, 318 (6th Cir. 2006) (internal quotations omitted); *accord Ross v. City of Memphis*, 423 F.3d 596, 603–04, 604 n.3 (6th Cir. 2005). And here, the officers have failed to make any showing of extraordinary circumstances.

We therefore affirm the district court's judgment that Bowers, Norris, and Jenkins are not entitled to qualified immunity on Grace's unreasonable-search claim. Bowers and Jenkins were among the first two officers to search Grace's home, and they conducted their illegal search with Norris's approval. *See Smith v. Heath,* 691 F.2d 220, 225 (6th Cir. 2010) (holding that an officer who directs his subordinates to interfere with the civil rights of another can be held liable for the subordinates' actions).

In regard to Ballard, Stanley, and Thompson, it seems the district court may have intended to grant summary judgment in their favor. Although Grace addressed her unreasonable-search claim to all the officers, the district court limited its analysis to Norris, Jenkins, and Bowers because they "were involved in the decision to enter the building in the first place." [R. 70, Op. and Order at PageID #1141.] The court did not elaborate on its decision to cabin its analysis to just those officers beyond that brusque statement. Moreover, the court specifically stated that it was "deny[ing] summary judgment as to Grace Burgess's unreasonable search claims against Officers Norris, Jenkins, and Bowers." [*Id.* at PageID #1158.] Naturally, the parties' briefing on this issue largely focuses on the conduct of Bowers, Norris, and Jenkins to the exclusion of the other officers.

But in the final section of its opinion, the court appears to have denied all the officers qualified immunity on Grace's unreasonable-search claim.

We are thus unable to provide meaningful appellate review of the district court's decision with respect to Grace's unreasonable-search claim against Ballard, Stanley, and Thompson. As such, we vacate that part of the district court's judgment and remand for the court to analyze Grace's claims against those officers. On remand, the district court must assess each officer's liability "individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008)). And it should make clear whether it is denying or granting qualified immunity to each officer.

IV

We turn now to William's claims. The officers initially contend that the district court erred in construing the Burgesses' pleadings as asserting Fourth Amendment unreasonable-search and false-arrest claims for William. We find that the court did no such thing.

*William's Purported Unreasonable-Search Claim.* The court's sole analysis of an unreasonable-search claim appears in the final three pages of its opinion. There, at the outset, the court stated that it was addressing "Grace Burgess's unreasonable search claim." [R. 70, Memorandum Op. and Order at PageID at PageID #1156.] At no point did it indicate that it was analyzing any unreasonable-search claim other than hers. And it ended its analysis by concluding that it was denying "summary judgment as to Grace Burgess's unreasonable-search claim[]." [*Id.* at PageID #1158.] We find, therefore, that the court did not construe the Burgesses' pleadings as stating a Fourth Amendment search claim for William.

*William's Purported False-Arrest Claim.* We likewise find that the court did not construe the Burgesses' pleadings as stating a Fourth Amendment false-arrest claim for William (or Grace,

for that matter). Near the beginning of its opinion, the court went out of its way to explain that, based on the parties' pleadings, it was exclusively construing William's false-arrest claim as arising under Tennessee state law. And the court went on to grant summary judgment to the officers on that claim. Conversely, the court noted that it was exclusively construing William's "unreasonable seizure claim" as arising under federal law, and it refused to grant summary judgment on that claim.[3]

*William's Payton Claims.* The officers' confusion stems from their failure to apprehend that the district court construed William's "unreasonable seizure claim" as a *Payton* claim. Consequently, much of the officers' argument misses the point. Essentially, the officers argue that they had probable cause to arrest William and so William's unreasonable-seizure claim, which they read as a false-arrest claim, must fail. But while it is true that the absence of probable cause is an essential element of a false-arrest claim, *see Stemler v. City of Florence*, 126 F.3d 856, 871 (6th Cir. 1997), the same is not true of a *Payton* claim.

A *Payton* violation occurs when, in the absence of exigent circumstances, an officer makes a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest, even if "probable cause is clearly present." *Payton v. New York*, 445 U.S. 573, 589 (1980) (internal

---

[3] Assuming William alleged a Fourth Amendment false-arrest claim, it must fail. A claim for false arrest rises or falls depending on whether the plaintiff can show, in light of clearly established law, that that no reasonably competent officer would have found there was probable cause to arrest him. *See Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007). Although William was ultimately acquitted of the charges against him, "it has been long settled that 'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer.'" *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006) (quoting *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)). Some exceptions to this rule exist, as "when the defendants knowingly present false testimony to the grand jury to obtain an indictment or when they testify with a reckless disregard for the truth." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 398 (6th Cir. 2016) (internal quotations omitted). But William has made no showing that any of these exceptions apply to his case.

quotation omitted). That said, *Payton* does not control our analysis. It is undisputed that William was arrested in Grace's home—not his own home. But *Payton* established a suspect's right to be free from a warrantless arrest in his own home—not someone else's. *See Payton*, 445 U.S. at 576 ("Hold[ing] that the Fourth Amendment . . . prohibits the police from making a warrantless and nonconsensual entry into *a suspect's home* in order to make a routine felony arrest.") (emphasis added). In fact, the *Payton* Court explicitly acknowledged that the "narrow question" presented in the case did not address the "authority of the police . . . to enter a third party's home to arrest a suspect." *Id.* at 583.

A little over one year after *Payton* was decided, the Court held that in order to enter a third party's home to arrest a suspect, the police need a search warrant. *Steagald*, 451 U.S. at 212. But as we noted in *Buckner*, *Steagald* was concerned with the Fourth Amendment rights of the third-party homeowner, not the Fourth Amendment rights of the suspect in the third party's home. *See Buckner*, 717 F.2d at 299. The latter issue, however, was squarely presented in *Buckner*. *Id.*

As it happens, there the suspect was challenging the police's entry into his mother's apartment to arrest him. *Id.* at 298. We denied the suspect relief based on standing, reasoning that there was "nothing in [the] record to indicate that the defendant had a legitimate expectation of privacy in his mother's apartment." *Id.* at 300. We noted that "the defendant did not live there and there [were] no facts other than his relationship to the occupant of the apartment which would show that he had standing to challenge the search of his mother's apartment." *Id.* Although the police had an arrest warrant for the suspect, they did not need it. *Id.* The suspect's rights were sufficiently protected by the presence of probable cause to arrest him.[4] *Id.* at 301.

---

[4] To be sure, we also held (in the alternative) that *if* the suspect had a reasonable expectation of privacy in his mother home, we would deny the suspect relief because the police had a warrant for his arrest. *Buckner*, 717 F.2d at 300. We reasoned that it was unnecessary for the police to have

Similarly, in *United States v. Love*, 70 F.3d 116, 1995 WL 675562 (6th Cir. 1995) (unpublished table decision), we held that a defendant could not challenge his warrantless arrest in his mother's home because he did not have a "legitimate expectation of privacy" in the residence. *Id.* at *4. In so holding, we noted that the defendant did not live there and was not an overnight guest. *Id.* Instead, we found that the defendant "was essentially a casual visitor." *Id.* "To be sure," we said, "the defendant is the house owner's son, but that relationship does not . . . establish an expectation of privacy, for Fourth Amendment purposes, beyond that of an unrelated invited guest making a brief visit." *Id.*

Thus, although *Payton* clearly establishes that a suspect has the right to be free from a warrantless arrest in his own home, it is substantially less clear when a suspect is entitled to claim the same right in someone else's home. Like the suspects in both *Bucker* and *Love*, William was not living in his mother's home when the officers arrested him. Nor is there any indication that he was an overnight guest. At the same time, William was certainly more than a casual visitor since he used Grace's basement as a workshop. But it is difficult to know what significance to assign that fact. The Burgesses described the workshop as "simply an area where [William] would build things." [R. 62, Supp. Resp. to Defs' Mot. to Dismiss at PageID #1069.] They also asserted that it made "no difference" to their claims that "William [] has a little workshop downstairs." [*Id.*] In any event, we need not decide today whether—under these circumstances—the officers violated William's constitutional rights when they arrested him in his mother's home without a warrant

---

a search warrant in addition to an arrest warrant because "[i]t would be illogical to afford the defendant any greater protection in the home of a third party than he was entitled to in his own home." *Id.* at 300. *See United States v. Pruitt*, 458 F.3d 477, 480–82 (6th Cir. 2006) (holding that an arrest warrant was sufficient to protect a suspect's Fourth Amendment rights in a third party's home where the suspect had "a limited expectation of privacy" as an overnight guest in the residence).

(but with probable cause).[5] It will suffice to say that, after extensive research, we cannot say that such a right, if it exists, was clearly established.[6] We therefore reverse the district court's judgment and hold that all of the officers are entitled to qualified immunity on William's unreasonable seizure claim.

V

*William's Excessive-Force Claims.* Finally, the officers argue that the district court erred in denying them qualified immunity on William's excessive-force claims. Those claims relate to Ballard's use of a canine and Stanley's and Thompson's use of tasers to apprehend William.

The right of an individual to be free from an officer's use of excessive force derives from the Fourth Amendment's prohibition against unreasonable seizures. *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989). "Whether the force was excessive turns on its objective reasonableness under the totality of the circumstances." *Baxter v. Bracey*, No. 18-5102, 2018 WL 5877253, at *2 (6th Cir. Nov. 8, 2018) (citing *Graham*, 490 U.S. at 395–96).

As we have noted recently, the law in our circuit with respect to excessive-force claims involving canine seizures is clearly established at the outer bounds. On one end of the spectrum, "we have held that officers cannot 'use[ ] an inadequately trained canine, without warning, to

---

[5] We are permitted to dispose of a claim based on the "clearly established" prong of a qualified-immunity analysis without having to determine whether an individual's constitutional rights were violated. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Doing so is often appropriate in cases where "the briefing of constitutional questions is woefully inadequate" and the opinion is designated as not precedential. *See Pearson v. Callahan*, 555 U.S. 223, 239 (2009). Since that is the case here, we limit our review of William's claim accordingly.

[6] We note that in *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984), we held that the police violated the defendant's Fourth Amendment rights when they arrested him at his mother's home without a warrant. *Id.* at 1166. But there, the facts strongly indicate that the defendant lived at the house, and so he had a legitimate expectation of privacy therein. *See id.* at 1165 (referring to the house as "[the defendant's] home"); *see id.* at 1168 (referring to the house as "the Morgan home").

apprehend two suspects who were not fleeing.'" *Baxter v. Bracey*, No. 18-5102, 2018 WL 5877253, at *2 (6th Cir. Nov. 8, 2018) (alterations in original) (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 789 (6th Cir. 2012)). On the other end, "we have upheld the use of a well-trained canine to apprehend a fleeing suspect in a dark and unfamiliar location." *Baxter*, 2018 WL 5877253, at *2 (citing *Robinette v. Barnes*, 854 F.2d 909, 913–14 (6th Cir. 1988)). "These cases and their progeny establish guidance on the ends of the spectrum, but the middle ground between the two proves much hazier." *Baxter*, 2018 WL 5877253, at *2.

Viewing the facts in the light most favorable to William, his case is much closer to *Robinette* than it is to *Campbell*. Like *Robinette*, "this is a case where an officer was forced to explore an enclosed unfamiliar area in which he knew a man was hiding." 854 F.2d at 914. When Ballard arrived on the scene, William was hiding in the crawlspace of the basement underneath a plastic vapor barrier and refusing to come out. Very little light entered the openings of the crawlspace, so the area was difficult to see and none of the officers could be sure that William was not armed. And because the crawlspace height was as low as eighteen inches in some areas, an officer would need to enter it on his hands and knees, making it difficult for an officer to defend himself.

Moreover, the officers repeatedly warned William to surrender or else they would deploy the canine.[7] Still, William refused to comply. So, as in *Robinette*, the officers were confronted with

---

[7] On appeal, William selectively quotes Stanley's trial testimony to support his claim that the officers "did not give any warning *when the K-9 found Mr. Burgess*." [Burgesses No. 18-5179 Response Br. at 8 (emphasis added).] But that does not contradict the officers' declarations—and the part of Stanley's trial testimony that William does not quote—that the officers gave William multiple warnings *before* Ballard deployed the dog to apprehend him:

> Q. And what did you witness? If you would, tell the jury what you witnessed when the K-9 unite arrived.
>
> A. Officer Ballard arrived. He came down the steps. He made — and I don't know what their protocol is, but they make announcements whenever they're going to

a man who "knew the building was surrounded, who had been warned . . . that a dog would be used, and who gave every indication of unwillingness to surrender." *Robinette*, 854 F.2d at 913 (ellipses in original).

Of course, the facts here do not match those in *Robinette* perfectly. There, the plaintiff was suspected of committing a felony. Here, in contrast, William was only suspected of committing a misdemeanor. William also makes much of the fact that the canine continued to bite him while he was being tased by the officers and after he was subdued. Still, William never rebutted the officers' declarations that they tased him because he was attempting to fight off the dog. And during his criminal trial, William admitted that Ballard called off the canine once the other officers finished tasing him and he was subdued.

We have said that "a delay in calling off [a] dog may rise to the level of an unreasonable seizure." *Greco v. Livingston Cty.*, 774 F.3d 1061, 1064 (6th Cir. 2014) (citing *Campbell*, 700 F.3d at 787). But it does not follow that Ballard violated William's clearly established constitutional rights just because there was some unspecified delay between the time he called off the dog and the time the canine reacted to his command. As the Supreme Court has exhorted, to be clearly

---

search an area, you know, Knox County Sheriff's Office, K–9. This is Officer Ballard. If you don't come out immediately with your hands up, I'm going to send in the dog, and so on and so forth. And he makes that announcement several times.

Q. Did you hear him making those kinds of announcements?

A. Yes, ma'am. I was standing a foot from him.

[R. 61-9, Officer Stanley Test. at PageID #745.] Furthermore, William admitted in his own testimony that the officers warned him about the dog:

Q. All right. Let's take it from that point right there. When — once you realized where was a dog — an officer and his dog, what happened?

A. Actually, at this point, I was in disbelief. They were actually in my mother's home with a dog. *And then they threatened me with — they threatened me with the dog*.

[R. 61-18, William Burgess Test. at PageID #934–35 (emphasis added).]

established, it is not enough that a legal principle "is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

The district court found that, "[e]ven adopting plaintiffs' version of the facts," William's case fell "somewhere in the middle of the spectrum" of our canine-seizure precedents where the law is not clearly established. [R. 70, Op. and Order at PageID #1153.] Nevertheless, it denied Ballard qualified immunity because it was "not left with a clear picture of the facts in this case." [*Id.* at PageID #1154.] This was error. Having concluded that William failed to show that Ballard violated clearly established law, the court should have granted him qualified immunity. *See Thompson*, 831 F.3d at 369. To the extent the court was uncertain about whether his conduct violated clearly established law even after adopting William's version of the facts, that was not a proper basis for denying qualified immunity. "Once a defendant invokes qualified immunity, the plaintiff bears the burden to show that qualified immunity is inappropriate." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013). Accordingly, we hold that Ballard is entitled to qualified immunity.

As with our canine-seizure cases, the law with respect to our taser cases is clearly established in two opposing situations: "It is clearly established in this Circuit that the use of a taser on a non-resistant suspect constitutes excessive force. Conversely, it is also clearly established that tasing a suspect who actively resists arrest and refuses to be handcuffed" does not violate the Fourth Amendment." *Kent v. Oakland Cty.*, 810 F.3d 384, 396 (6th Cir. 2016) (internal quotations omitted). Based on the undisputed facts, we find that William's case is closer to the latter situation than the former. William never disputed Stanley and Thompson's explanation that

they tased him because he was stomping the canine's head with his right foot in the crawlspace. Nor did he dispute the officers' statements indicating that they tased him for only as long as was necessary to subdue him.

The district court denied Stanley and Thompson qualified immunity because, in its view, "it is not clear whether William Burgess was resisting arrest or whether the taser was deployed after the dog" began biting William. [R. 70, Op. and Order at PageID #1155.] The court reasoned that if the tasers were deployed after the canine began biting William, then he "had a right to be free from" being tased. [*Id.*] But in so reasoning, the court created a false dichotomy. The court never explained why William could not have been resisting arrest *while* the dog was trying to apprehend him. And we find no basis in the record or the law to suggest that the two are mutually exclusive. *See McQueen v. Johnson*, 506 F. App'x 909, 916 (11th Cir. 2013) (finding that the simultaneous use of tasers and a canine were a reasonable use of force against a noncompliant suspect). As such, we find that Stanley and Thompson are entitled to qualified immunity.

The district court's order is ambiguous as to whether it was denying Bowers, Norris, and Jenkins qualified immunity on William's excessive-force claims, too. But we hold that they are entitled to qualified immunity as well since there is no allegation that they used any force against William. We construe the district court's order as denying all the officers qualified immunity on William's excessive-force claims. As such, we reverse that part of the district court's judgment.

VI

For the foregoing reasons, we AFFIRM in part, REVERSE in part, and VACATE in part the judgment of the district court. And we REMAND for proceedings consistent with this opinion.