RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0132p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

ROSEMARY WHITE; MI-CHOL WHITE,

         *Plaintiffs-Appellants*,

     *v.*

CITY OF DETROIT, MICHIGAN; SHIRLENE T. CHERRY, Detroit Police Officer,

         *Defendants-Appellees*.

No. 21-1746

────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-12646—Mark A. Goldsmith, District Judge.

Decided and Filed:  June 17, 2022

Before:  SUTTON, Chief Judge; KETHLEDGE and READLER, Circuit Judges.

────────────────

## COUNSEL

────────────────

**ON BRIEF:**  Zachary T. Runyan, Michael L. Jones, MARKO LAW, PLLC, Detroit, Michigan, for Appellants.  Sheri L. Whyte, CITY OF DETROIT, Detroit, Michigan, for Appellees.

────────────────

## OPINION

────────────────

SUTTON, Chief Judge.  In the course of a law enforcement encounter involving two individuals—an officer and a fleeing suspect—two dogs became the victims.  Searching for a gun discarded by the suspect in a chase through a neighborhood, an officer used a trained dog, Roky, to find the gun.  As they walked along a fence surrounding a yard, another dog, a pit bull named Chino, lurched through the fence, bit Roky, and would not release him.  After a struggle and plenty of yelling and yelping, the officer shot and killed Chino.  A federal constitutional

claim came next.  Lamentable though the incident was for dog and owner, no constitutional violation occurred.  We affirm the district court's grant of summary judgment in favor of the officer and the City of Detroit.

I.

In the early afternoon of August 3, 2020, Detroit police officers apprehended a fleeing suspect who had run across several yards.  One of those yards belonged to Rosemary White.  Believing that the suspect had disposed of a weapon nearby, officers called in a canine unit to search for it.

Bodycam and security camera footage captured the events that followed.  Officer Shirlene Cherry arrived at the scene with her trained canine, Roky.  The White family had two dogs outside, Chino, a pit bull, and Twix, a Yorkie Terrier.  Officer Cherry asked White's daughter, Mi-Chol, to secure the dogs during the search for the weapon.  Mi-Chol grabbed Chino to put him inside their home, but he escaped and ran to the front yard.  Mi-Chol went inside to grab a leash.  With Chino still roaming the fenced-in yard, Officer Cherry decided to take Roky to a neighboring yard to search there first.  They walked along the perimeter of the wrought-iron fence toward the next yard while Chino followed them from the other side of the fence.

Then the unexpected happened.  As Officer Cherry and Roky reached the corner of the yard, Chino lurched through the fence's vertical spires and bit down on Roky's snout.  Roky yelped.  Cherry turned and saw Roky trapped up against the fence with his nose in Chino's mouth.  Cherry tugged at Roky's leash and yelled at Chino to "let go."  R.38-3 at 3.  Nothing changed.  Chino began "thrashing," "swaying back and forth in an effort to tear" what he was holding.  R. 38-4 at 7.  Unable to free Roky and afraid for the dog's life, Cherry unholstered her gun and shot Chino once.  Six seconds passed between Chino's attack and Cherry's shot.  After the shot, Chino released the now-bloodied Roky.  Chino died from the shot.

Rosemary and Mi-Chol White sued the officer and the City of Detroit.  Along with several state law claims, they alleged that Cherry violated the Fourth Amendment when she shot Chino.  They also claimed that Detroit failed to train its employees adequately to deal with this kind of encounter.  The district court granted summary judgment for the defendants on the

federal constitutional claims. And it dismissed the Whites' state law claims without prejudice to bringing them in state court.

II.

Qualified immunity shields Officer Cherry from the federal claim unless (1) she violated the Whites' constitutional rights, and (2) case law clearly established those rights at the time. *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam). In gauging this qualified immunity claim at summary judgment, we consider the facts in the light most favorable to the Whites, the claimants. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014).

The constitutional right at issue—the Fourth Amendment as incorporated via the Fourteenth Amendment—protects the "people" and their "effects" from "unreasonable" "seizures." U.S. Const. amend. IV. All agree that Officer Cherry "seized" Chino. *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016) (collecting cases). And neither party disputes that an individual's dog, unsentimental and ungrateful though the characterization may seem, counts as an "effect." *See id.*; *see also Altman v. City of High Point*, 330 F.3d 194, 200–04 (4th Cir. 2003) (discussing text and history to find that shooting a dog constitutes the seizure of "effects" under the Fourth Amendment). That leaves reasonableness, the reasonableness or not of Officer Cherry's decision to shoot the dog.

Absent an historical analogy that dictates the answer (and we know of none), we weigh the costs of the intrusion to the individual and the purported benefits to the government from the seizure. That requires us to "balance the nature and quality of the" Fourth Amendment intrusion "against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). Whether viewed from the perspective of a child or a parent, only the most cold-hearted, or allergy-ridden, individual could deny the "attachment between a dog and an owner" or deny that individuals experience a traumatic and lasting loss when the police kill their pet. *Brown*, 844 F.3d at 568. All considerations accounted for, we ask: Was the seizure "more intrusive than necessary"? *Florida v. Royer*, 460 U.S. 491, 504 (1983).

Shooting a pet, while always unfortunate, is not always unreasonable. An officer may reasonably use lethal force against a pet that poses an "imminent threat." *Brown*, 844 F.3d at

568. The perceived likelihood, nature, and severity of the threat inform this analysis. *See id.* at 568–70; *Richards v. City of Jackson*, 788 F. App'x 324, 333–35 (6th Cir. 2019). In gauging that threat, we remain mindful that police officers frequently "make split-second judgments" about their use of force in "tense, uncertain, and rapidly evolving" circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). All of this prompts us to look at the confrontation through the lens of a "reasonable officer on the scene," not sanitized judicial hindsight. *Id.* at 396; *see also Brown*, 844 F.3d at 567–68.

Officer Cherry acted reasonably at each turn. The threat had imminence written all over it. Cherry immediately and sensibly reacted to Roky's yelp and its cause, a pit bull's clenched-down grip on his nose. The threat also appeared severe and unrelenting. Within seconds, as the video footage confirms, Chino began "thrashing" back and forth, pivoting solely on Roky's hapless snout. R.38-4 at 7. Thrashing of this sort, as the record and common sense confirm, means a dog has "a good hold of something." *Id.* Officer Cherry fairly believed that Roky faced serious, if not deadly, consequences if she did not act.

What of the alternatives? What of other reasonable options short of Officer Cherry's lethal use of force? *Royer*, 460 U.S. at 504. Commands for Chino to "let go" did not do the trick. Several forceful pulls on the leash still left Roky at Chino's unmistakable beck and unrelenting call. Only the ignorant peace of a judge's chamber would prompt the passing thought that the officer should use her hands to remove the one dog from the other. That of course would replace one hazard with another, and in the process insert the officer, never a judge, into harm's path. Officer Cherry, it is true, had a taser, and perhaps a taser might have spared Roky *and* Chino. But Officer Cherry believed that the taser would serve only as a "muscle stimulant" and further "lock [Chino's] jaw," leaving Roky in continuing peril. R.38-4 at 7. Maybe; maybe not. But there were enough maybes in this unnerving situation to permit Officer Cherry to respond to these "tense, uncertain, and rapidly evolving" circumstances, *Graham*, 490 U.S. at 397, with decisive action that increased the likelihood of saving Roky: shooting the source of the peril. Shooting an attacking dog to save a behaving police dog is not unreasonable.

The Whites raise several contrary arguments.

They point out that Roky might not have faced death or serious harm given the non-permanent injury he ultimately experienced and Cherry's later characterization of Chino's threat as "active aggression" rather than "deadly force." But we assess the nature of the threat at the time of the incident, not after the fact of it. *Mullins v. Cyranek*, 805 F.3d 760, 766–67 (6th Cir. 2015). This pit bull's clamped bite and thrashing behavior leave no doubt about the seriousness of this threat. Cherry reasonably feared that Roky faced more severe and perhaps deadly harm—say a snapped neck—the longer Chino clenched down and thrashed. Delay sometimes looks good in hindsight, sometimes not. The Fourth Amendment does not require officers to wait for the answer before they act.

The Whites insist that Officer Cherry shot Chino "immediately" after he bit Roky and "took no other efforts to disengage the dogs." Reply Br. 7. But the pictures from the video evidence directly contradict these words. After hearing Roky's scream, Officer Cherry tugged at the leash and yelled at Chino to let go. Six seconds elapsed from Chino's bite before Cherry fired her gun. Fast though this seems, it is precisely the kind of imminent harm that officers too often face and must have firm resolve to address promptly. *See Scott v. Harris*, 550 U.S. 372, 383–85 (2007); *Graham*, 490 U.S. at 397.

What of *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962 (9th Cir. 2005)? In that case, the Whites note, the Ninth Circuit ruled that the killing of guard dogs was unreasonable because the officers knew one week before the execution of a search warrant that dogs guarded the property yet never considered non-lethal ways to deal with the problem. *Id.* at 977. To lay out these facts is to exonerate Officer Cherry. She did not know about Chino until she arrived. And she avoided searching the Whites' yard while Chino remained unleashed.

But why, the Whites add, didn't Officer Cherry completely avoid this risk by walking farther away from the fence? In hindsight, everyone wishes she had done just that. But the assumption that a fence will not operate like a fence requires a level of vigilance and a form of risk avoidance that the Fourth Amendment simply does not regulate. To repeat, to repeat again, the question at hand is whether the officer behaved reasonably at the time of the encounter, "not whether it was reasonable for the police to create the circumstances." *Livermore ex rel. Rohm v.*

*Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (quotation omitted).  The question is not whether the officer, the past considered, acted in the best way possible.  *Brown*, 844 F.3d at 572.

The Whites maintain that the threat at issue (police-canine safety) differs from the threat that courts often consider (police-officer safety).  *E.g.*, *id.* at 568.  Fair point.  "There is not a lot of law about the Fourth Amendment and dogs."  *Hardrick v. City of Detroit*, 876 F.3d 238, 246 (6th Cir. 2017).  Even so, no court to our knowledge has held that the Fourth Amendment requires officers to stand down when another animal threatens to harm severely (and perhaps kill) a police dog.  Sure, "the safety of Officers is more important than the safety of police dogs," as the Whites point out.  Appellant's Br. 36.  But that does not remove the officer's interest in protecting a police dog from the balance sheet.  Police dogs have become an essential component of law enforcement.  They are highly trained and have "proven useful in a variety" of dangerous law enforcement settings, *Robinette v. Barnes*, 854 F.2d 909, 914 (6th Cir. 1988), including search and rescue, evidence detection, discovery of explosives, crowd control, and suspect apprehension.  In this case, Roky was trained as a "patrol K-9," meaning he helped with "narcotics, tracking, article searches, building searches," and the like.  R.51-1 at 50.  While police dogs may not "solve all our problems," no one can deny that they "protect and help keep alive the officers we pay to catch those dangerous criminals who violate our laws."  *Chew v. Gates*, 27 F.3d 1432, 1475 (9th Cir. 1994) (Trott, J., concurring in part).  Whether considered a member of the police force or merely police property, these dogs serve a much-valued public interest.  Consistent with that interest, federal and state laws alike impose enhanced penalties for those who harm police dogs.  *See* 18 U.S.C. § 1368; Mich. Comp. Laws § 750.50c.

Switching gears, the Whites fear that our approach does not dignify the life of *their* dog. The more the Fourth Amendment permits an officer to account for the risk to life of a K-9 dog (say Roky), they suggest, the more it should consider a family's affection for its pet (say Chino). Fair point again.  But even if a family dog does not get the dignity it deserves under the words of the Fourth Amendment—a lifeless-sounding "effect"—it does receive considerable protection under the guarantee.  Judges, we can attest, appreciate that a family's "emotional attachment" to its dog does not remotely parallel "a possessory interest in furniture" or other effects of a home. *Hells Angels*, 402 F.3d at 975.  Yes, that description of a family's affection for its dog fails to

capture the point in full.  But even poets come up short.  "Nell's small grave, opening at the garden's edge to receive her out of this world's sight forever, reopens many graves.  Digging, the old man grieves for his old dog with all the grief he knows, which seems again to be approaching enough, though he knows there is more."  Wendell Berry, *Leavings: Poems* 38 (2010).

The problem in this case is not the law's lack of appreciation for the Whites' love of their dog.  It is that the lives of *two* dogs were at risk.  Officer Cherry permissibly considered that reality in killing one and saving the other.

That leaves one mundane detail.  In addition to their claim against Officer Cherry, the Whites brought a claim against the City of Detroit.  But as the parties agree, no such liability arises in the absence of an underlying constitutional violation.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

We affirm.